Riss & Company, Inc. (A Delaware Corporation), Transferee, et al. [1] v. Commissioner. Riss & Co. v. Commissioner
Docket Nos. 74950-74954, 77065, 78372, 81486, 81487.
United States Tax Court
T.C. Memo 1964-190; 1964 Tax Ct. Memo LEXIS 145; 23 T.C.M. (CCH) 1113; T.C.M. (RIA) 64190; July 14, 1964
Robert L. Jackson, for the petitioners. Sylvan Siegler, and Hugh McMahon, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: These proceedings, consolidated for hearing and decision, involve deficiencies in income tax and additions to tax as follows: Deficiencies
Additions
to the
Tax Under
Sec. 293(a)
Sec.
6653(a)
I.R.C.
I.R.C.
Docket No. and Taxpayer
Year
Income Tax
1939
1954
74950 - Riss & Co.
1952
$1,258,749.23
$26,858.35
1953
2,183,447.81
30,761.94
74951 - Riss & Co.
1952
1,258,749.23
26,858.35
1953
2,183,447.81
30,761.94
74952 - T.M. & E.
1949
139,184.54
1950
268,941.19
1951
343,411.53
1952
599,259.08
1953
645,773.63
$36,792.40
74953 - T.M. & E.
1949
139,184.54
1950
268,941.19
1951
343,411.53
1952
599,259.08
1953
645,773.63
$36,792.40
74954 - Riss, Sr.
1952
81,418.11
4,070.91
1953
186,870.35
9,343.52
1954
58,767.60
$ 2,938.38
77065 - Oklahoma-Colorado
1952
25,200.11
1953
12,929.97
1954
6,225.45
78372 - T.M. & E.
1956
308,364.64
15,418.23
81486 - Riss, Sr.
1955
18,903.98
945.20
81487 - Riss, Sr.
1956
44,865.76
* * *
*148 By stipulation entered into by counsel at the beginning of the trial, the above shown additions to tax under sections 293(a) and 6653(a) of the 1939 and 1954 Codes, respectively (negligence penalties), were substituted for the additions to tax under subsection (b) of those Code sections (fraud penalties) asserted in the notices of deficiency, and the pleadings have been amended accordingly. The deficiencies and additions to tax in Docket Nos. 74951 and 74953 are asserted against the petitioners as transferees of the petitioners in Docket Nos. 74950 and 74952 and the transferees concede that they are liable for any deficiencies or additions to tax found to be due from the transferors. A number of the issues raised in the pleadings have been settled by stipulation, which will be given effect under Rule 50 settlement. Numerous facts have also been stipulated. [2]
A statement of the facts pertaining to each of the remaining issues [3] in the several proceedings and the discussion pertaining thereto will be set out under separate headings *149 below, following a statement of the general facts. To avoid any unnecessary prolongation of this opinion, restatement of the issues settled by stipulation, and the facts pertaining thereto, will be omitted. The issues not covered by the stipulation with respect to which the briefs submitted by the parties contain no proposed findings of fact and no argument will be deemed abandoned. For convenience, petitioner, Riss & Company, Inc., Delaware, Docket No. 74950, and Riss & Company, Inc., Colorado, Docket No. 74951, will both be referred to, generally, as Riss & Company; petitioners Transport Manufacturing & Equipment Company of Delaware, Docket No. 74952, and Transport Manufacturing & Equipment Company, Illinois, Docket No. 74953, will be referred to as T.M. & E.; and petitioner Oklahoma-Colorado Freight Lines, Inc., Docket No. 77065, will be referred to as Oklahoma-Colorado. Findings of Fact - General The stipulated facts are so found. Riss & Company, T.M. & E. and Oklahoma-Colorado are all Delaware corporations with offices located at Kansas City, Missouri. The returns of all three corporations *150 were filed with the district director of internal revenue at Kansas City, Missouri. Richard R. Riss, Sr., one of the founders of Riss & Company, is the chief executive officer of all there corporations. At all times here material Riss & Company was a common carrier engaged in motor freight transportation in interstate and intrastate commerce. T.M. & E. owned and leased to Riss & Company most of the transportation equipment and truck terminals used in its business. During the years involved, Riss & Company operated in 22 states, principally in the eastern section of the United States. It had approximately 3,600 miles of operating rights under the approval of the Interstate Commerce Commission. It was incorporated under the laws of the State of Colorado in 1927 under the name of Riss & Quinn. Its name was changed to Riss & Company, Inc., in 1932. On June 27, 1956, it was reincorporated under the laws of the State of Delaware with the same capital structure, consisting of 20,000 class A common shares of a par value of $1 each; 8,000 class B common shares, par value $1 each; and 50,000 preferred shares, par value $10 each. All of the outstanding class A common stock (which was the *151 only voting stock) of Riss & Company was owned, over the 1949-1955 period, by Riss, Sr., and a majority of its class B stock was owned by his children and grandchildren. Some of the class B shares, 5,355, were owned by T.M. & E. at one time, but prior to February 1952 these shares were acquired by Richard S. Riss, II, and Robert B. Riss, hereinafter sometimes referred to as Richard and Robert, sons of Riss, Sr. Substantially all of the stock of T.M. & E. was owned, by Riss, Sr., and his children and grandchildren. Riss, Sr., was chairman of the board of Riss & Company and of T.M. & E. Robert became president of Riss & Company, May 22, 1950, Richard became president of T.M. & E. in 1951. The two companies had their offices at the same location, and, for the most part, utilized the same office force and facilities. They both kept their books and made their income tax returns on the basis of an accrual method of accounting and for a calendar year. From time to time T.M. & E. leased terminal facilities and equipment to others than Riss & Company and engaged in other business activities, to a limited extent. Its principal business has always been owning and leasing, to Riss & Company, *152 tractors, trailers and terminal facilities. It has never itself engaged in the common carrier business. At all times here material, Riss, Sr., directed the affairs of both companies. Although Richard was the duly elected president of T.M. & E. during the years here involved, he was under the direction of Riss, Sr. Oklahoma-Colorado was organized January 1, 1947. It also acquired and owned trailers and other equipment which it leased to Riss & Company. Its stock was owned by T.M. & E. until December 22, 1952, when it was purchased by Riss, Sr.'s three children. It also had the same address and occupied the same office as Riss & Company. Issue 1 (II-III-IV) [4]
Business Expenses - Rentals - Paid to T.M. & E. by Riss & Company Findings of Fact During the years 1952, 1953 and 1954, Riss & Company operated a large number of tractors and trailers, most of which it leased from T.M. & E., and paid annual rentals thereon in excess of one-half million dollars. These rentals corresponded to the depreciation deductions on the equipment which T.M. & E. set up in its *153 books and deducted in its returns. The rentals were designed to return to T.M. & E. the cost of the equipment plus financing charges and a nominal amount to cover bookkeeping costs. It was the intention of the parties that T.M. & E. should not realize any substantial profits on the rental of the equipment to Riss & Company. T.M. & E. was organized chiefly as a business convenience to Riss & Company and as a means of enabling Riss & Company to meet certain requirements of the Interstate Commerce Commission at a minimum cost and inconvenience. T.M. & E. performed no functions with respect to the leased equipment other than to sign the mortgages and notes, execute the lease agreements with Riss & Company, and pay over the rentals received from Riss & Company to the sellers of the equipment. All costs of repairs and other expenses of operating the equipment were borne by Riss & Company. The equipment leased to Riss & Company by T.M. & E. included hundreds of trailers, tractors, trucks and other equipment purchased at various times. [5] It was greatly increased after about 1948 when Riss & Company abandoned the so-called "provider" system, whereby a large portion of its hauling was done *154 under contract by third parties who furnished their own equipment. Early in 1954, under a broad expansion program, T.M. & E. purchased for lease to Riss & Company approximately $15,000,000 of new trailers and tractors. This equipment included 800 trailers purchased from Fruehauf Trailer Co., which T.M. & E. entered in its books at a cost of $5,338.55 each; 400 trailers entered at a cost of $7,850 each; and 497 G.M.C. diesel tractors purchased from General Motors Corporation, which it entered in its books at a cost of $12,661.15 each. At that time Riss & Company was operating about 100 of its own trailers and a number of trailers rented from T.M. & E., on which rentals were paid to T.M. & E. in 1954 of approximately $1,500,000. All of the new equipment was leased to Riss & Company under lease agreements in which the rentals were geared to the depreciation deductions set up in T.M. & E.'s books. The depreciation was computed on a double declining *155 balance method. Under the lease agreements the monthly rentals on the 800 Fruehauf trailers declined from $180.79 per unit for the first year to $53.95 per unit for the sixth year, and on the G.M.C. tractors from $595.42 per unit per month in the first year to $25.77 per unit per month in the fifth year. In purchasing its equipment, prior to 1954, T.M. & E. usually made a nominal, or no, down payment and gave the seller a chattel mortgage for the balance of the purchase price. Simultaneously, it leased the equipment to Riss & Company for a term coextensive with the mortgage and assigned the lease to the seller as security on the mortgage, as required under the purchase agreement. In some instances T.M. & E. would also give the seller a mortgage on equipment which it already owned as additional security. Under both the purchase agreements and the lease agreements, Riss & Company was unconditionally obligated for the purchase price of the equipment, on default of payment by T.M. & E. The equipment was all to be returned to T.M. & E. at the and of the lease term. Under substantially the same conditions as described above, T.M. & E. leased to Riss & Company in 1954, 16 new Fruehauf *156 tank trailers, costing $7,030 per unit, and in 1955 and 1956, 50 Diamond T Tractors, costing $4,525.56 per unit. The rentals which Riss & Company paid to T.M. & E. on the above described equipment were, on the whole, not in excess of the rentals that Riss & Company would have had to pay independent motor vehicle leasing concerns on such equipment. It was not an unusual practice in the motor transportation industry for motor freight carriers to rent the equipment used in their business. In determining the deficiencies herein the respondent made adjustments in the rental deductions claimed by Riss & Company on some but not all of its rented equipment. Following are shown the total amounts of the rental deductions claimed by Riss & Company with respect to equipment as to which adjustments were made, and the amounts allowed by respondent in each of the years 1952 to 1955, inclusive: 1952
1953
Equipment
Claimed
Allowed
Claimed
Allowed
(1) 1200 Fruehauf
Trailers
(2) 150 Fruehauf
Trailers
$159,810
$73,320
$219,000
$ 93,600
(3) 100 Strick
Trailers
112,000
76,594
(4) 16 Tank Trailers
(5) 497 G.M.C.
Tractors
(6) 50 Diamond T.
Tractors
Totals
$159,810
$73,320
$331,000
$170,194
*157 1954
1955
Equipment
Claimed
Allowed
Claimed
Allowed
(1) 1200 Fruehauf
Trailers
$1,702,628
$ 590,285
$2,483,522
$1,594,673
(2) 150 Fruehauf
Trailers
219,000
93,600
219,000
93,600
(3) 100 Strick
Trailers
192,000
131,085
189,760
129,990
(4) 16 Tank Trailers
3,750
1,992
43,895
23,905
(5) 497 G.M.C.
Tractors
1,383,160
598,962
2,892,284
1,527,186
(6) 50 Diamond T.
Tractors
122,388
63,658
Totals
$3,500,538
$1,415,924
$5,950,849
$3,433,012
Opinion Respondent's adjustments of Riss & Company's rental deductions are based upon what he determined to be a reasonable rental for each item of the leased equipment, in accordance with the recommendations of the several revenue agents who examined petitioner's books and records. On brief, respondent argues that the lease agreements were not arms-length transactions and that the reasonableness of the rentals agreed upon is brought into question by the close relationship of the parties. Obviously, Riss & Company and T.M. & E. had no adverse economic interests. They had substantially the same stockholders and were under control of the same executive offices. Whether or *158 not the lease agreements were arms-length transactions or the rentals reasonable in amount, our question is whether the rentals paid were ordinary and necessary business expenses which Riss & Company was required to pay for the use of the equipment. See Roland P. Place, 17 T.C. 199, affd. 199 F. 2d 373, certiorari denied 344 U.S. 927; Southern Ford Tractor Corporation, 29 T.C. 833. Respondent does not question the bona fides of the leases, except as to the amounts of the rentals in some of them. He makes no contention that the lease arrangements were spurious and should be disregarded for tax purposes. Neither has he determined, nor does he presently contend, that the rentals paid to T.M. & E. by Riss & Company resulted in a distortion of the income of either corporation, requiring reapportionment of income or deductions between them, under section 45 of the Internal Revenue Code of 1939 and section 482 of the Internal Revenue Code of 1954. Respondent does not contend, either, that the alleged excessive rentals paid by Riss & Company resulted in any tax advantage to the group as a whole. The petitioners *159 insist that they did not, pointing out that T.M. & E. was in a higher tax bracket than was Riss & Company, so that no advantage would have been gained by such a shift of income. In any event, the evidence indicates that the lease arrangements were not designed as a tax avoidance scheme. We see nothing inherently wrong in gearing the rentals to be paid by Riss & Company on the equipment purchased in 1954 and 1955 to the depreciation deductions taken on that equipment by T.M. & E., computed on a double declining balance basis. A reasonable argument might be made in favor of the declining rentals where, as here, the lessee was to bear the cost of maintaining the equipment which naturally increased with age and usage. This plan of gearing the rentals to the depreciation deductions had been followed consistently in prior years, before T.M. & E. adopted the double declining balance method of computing depreciation on its equipment. In this connection it is noted that respondent now concedes that the depreciation deductions claimed by T.M. & E., computed on a declining basis, on most of the leased equipment in 1955 and 1956 are allowable. Respondent makes the further argument in his *160 brief that the higher rentals paid in the earlier years of the leases which provided for declining rentals were in the nature of advance rentals and therefore were capital expenditures, deductible in the year for which paid or ratably over the years for which paid, citing Harry W. Williamson, 37 T.C. 941. There is no factual support for this theory in the evidence of record. There is nothing to indicate that in making the lease arrangements either of the parties had any intention of providing for prepayment of rentals on the equipment, or that it would have been to their advantage, taxwise, to do so. Their sole purpose seems to have been to have the rental payments correlated with the depreciation deductions taken by T.M. & E., consistent with their recognized purpose to limit T.M. & E.'s profits on the transactions. Again it is pointed out that our question is not whether the agreements under which the rentals were paid were the most appropriate or economically sound, but whether the payments were bona fide rentals required to be paid for the continued use of the property. We think that they were. As to the equipment purchased by T.M. & E. in 1954 and 1955, on which *161 the rentals were fixed on a declining basis, conforming to the depreciation deductions set up by T.M. & E., respondent has made no adjustment of the all-over rentals paid by Riss & Company but he contends that they should be spread ratably over the entire term of the lease and that, consequently, the rentals deducted by Riss & Company in 1954 and 1955 were excessive. Respondent has made no corresponding adjustments in the rental income of T.M. & E. by reason of the partial disallowance of rental deductions claimed by Riss & Company for 1952 and 1953, or prior years. However, for 1954, 1955 and 1956, he determined that the rental income reported by T.M. & E. was overstated to the extent of the amounts by which he had reduced the rental deductions claimed by Riss & Company in those years. By amendment to his pleadings respondent now contends, affirmatively, that notwithstanding his adjustments of Riss & Company's rental deductions for 1954, 1955 and 1956 T.M. & E. is taxable on all of the rental income received from Riss & Company in those years. After careful consideration of all the evidence and giving due weight to the arguments made by the parties, we are of the opinion that *162 Riss & Company is entitled to deduct as business expenses all of the rentals paid to T.M. & E. for the use of the leased equipment. Our determination on this issue removes from consideration the question of T.M. & E.'s liability for tax on the amounts of rental deductions disallowed Riss & Company. Issue 2 (VIII, IX, X, LIV, LV) Depreciation - Riss & Company, T.M. & E. and Oklahoma-Colorado
Depreciation issues relate to Riss & Company for the years 1952 to 1955, inclusive, to T.M. & E. for the years 1949 to 1956, inclusive, and to Oklahoma-Colorado for the years 1952 and 1953. There are disputes as to the useful life, salvage value and other factors pertaining to depreciation allowances on hundreds of different items of equipment, including trailers, tractors, trucks and others. Some of the depreciation issues have been removed from consideration and others narrowed by stipulation. Findings of Fact As to Riss & Company, the specific items in controversy include 99 Corbitt tractors and 50 Dodge trucks acquired during 1950 and 1951, 25 Dodge trucks acquired in 1952, and 400 refrigerating units acquired in 1954. The tractors and trucks were acquired under lease agreements *163 with T.M. & E. which ran for 4 years, with an option to purchase for a nominal price. This equipment was all acquired for city delivery use, as distinguished from over-the-road, long-haul use. Riss & Company deducted the payments made under the lease agreements as rentals but it now concedes that they were outright purchase money payments, as determined by respondent in his notice of deficiency. Respondent allowed Riss & Company depreciation deductions computed on the basis of a useful life of 7 years and a salvage value of $400 per unit for the 99 Corbitt tractors, a useful life of 7 years and a salvage value of $300 for the 50 Dodge trucks, and a useful life of 8 years and a salvage value of $300 for the 25 Dodge trucks. The tractors and trucks had an average useful life of 6 years and a reasonably expected salvage value of 10 percent of cost. Also included in the Riss & Company equipment, subject to the depreciation dispute, were 400 Thermo-King refrigerating units which Riss & Company acquired in 1954 for installation in the trailers which it leased from T.M. & E. in that year. These units were acquired under leasepurchase agreements, extending over a period of 3 years. The payments *164 thereon were deducted as rentals by Riss & Company in the amounts of $149,436 in 1954 and $269,232 in 1955. It is now stipulated, as with the tractors and trailers discussed above, that the refrigeration units were acquired by purchase rather than leased, as determined by respondent, and are subject to depreciation deductions. In his determination respondent computed depreciation on the units on a straight-line basis over a period of 6 years. It is stipulated, however, that depreciation deductions may be taken under the double declining balance method and that petitioner's basis for depreciation is $867,388. All of these units were sold by Riss & Company in 1957 after an average usage of approximately 3 years for $506,250. As to T.M. & E., the total depreciation and amortization deductions claimed and the amounts allowed by respondent for each of the years 1949 to 1956, inclusive, are as follows: Amount
Amount
Amount
Year
Claimed
Allowed
Disallowed
1949
$ 460,225.23
$ 144,290.56
$ 315,934.67
1950
714,510.38
242,086.40
472,423.98
1951
889,598.19
324,071.84
565,526.35
1952
1,102,530.64
450,610.35
651,920.29
1953
1,250,114.88
619,312.41
630,802.47
1954
3,682,662.39
1,919,475.90
1,763,186.49
1955
5,098,025.64
3,515,971.33
1,582,054.31
1956
3,069,446.56
2,409,770.24
659,676.32
*165 There were over 3,000 different items of equipment involved in the depreciation computations including various tractors, trailers, trucks and other equipment. On most of these items respondent increased the useful life, over that used by petitioner in its returns, and attributed to some, particularly the trailers, salvage values amounting to over 70 percent of cost and an average salvage value of over 50 percent was attributed to 17 different groups of trailers, with about 1,300 different units not including the 1,200 Fruehauf trailers and 16 tank trailers purchased in 1954 on which depreciation was computed on a double declining balance basis. As to the 1,200 Fruehauf trailers and the 497 G.M.C. tractors purchased from Fruehauf in 1954, T.M. & E. claimed depreciation deductions on a double declining balance basis, spread over a period of 4 years for the tractors and 6 years for the trailers. It did not set up any salvage values for any of the equipment. Respondent now concedes that the use of the double declining balance method of depreciating the equipment over a useful life of 4 years for the tractors and 6 years for the trailers was proper. However, the parties are still in *166 disagreement both as to the time for the commencement of depreciation by T.M. & E., on some of the equipment and its salvage value. T.M. & E. computed depreciation on the trailers by reference to the dates of the voices received from the manufacturers, which were mailed to T.M. & E. when the equipment was ready for service, whereas the respondent contends that depreciation should begin from the date when the equipment was actually delivered to and put into service by Riss & Company. Petitioner commenced depreciation on the first of the month where the invoices were dated on or before the 15th, and on the first of the succeeding month where they were dated on the 16th or later. Respondent has allowed a full month's depreciation for the month in which the delivery was made. The trailers were manufactured at Freuhauf plants located at Memphis, Tennessee and Westfield, Massachusetts, and, in accordance with the purchase agreements, were placed on parking lots on the manufacturer's premises waiting to be picked up by Riss & Company at its convenience. At about the time of its purchase of the 1,200 new trailers from Fruehauf in 1954, T.M. & E. sold to Fruehauf practically all of its *167 presently owned trailers, 771, then under lease to Riss & Company, for $2,731,070.06. Included in the sale were 130 trailers owned by Colorado-Oklahoma and Louise Riss, which were also leased to Riss & Company. The negotiations for the purchase of the new equipment and the sale of the used trailers were concluded about the middle of 1954. Fruehauf was billed for the old trailers purchased from T.M. & E., December 31, 1954, and later paid the purchase price by check. The cost of the 771 units to T.M. & E. was $3,417,463.18. The trailers had been in service an average of about 50 months, 140 of them having been purchased by T.M. & E. in 1948, 239 in 1949, 73 in 1950, 122 in 1951, and 197 in 1952. The depreciation deduction claimed on them by T.M. & E. since their acquisition, based on a useful life of 5 years for new trailers and 3 years for used ones, amounted to approximately $2,878,244.15. In his computation of the depreciation allowances on the trailers, respondent assigned to them at the time of their acquisition by T.M. & E. a salvage value equal to their sale price in 1954, and allowed only $948,521.06 of the depreciation deductions of over $2,800,000 claimed by T.M. & E. Also *168 during the years 1954, 1955 and 1956, T.M. & E. purchased 50 Diamond T tractors, 16 Fruehauf tank trailers and 16 G.M.C. trucks on which it computed depreciation deductions under a double declining balance method, based on a useful life of 4 years for the tractors and trucks and 6 years for the tank trailers. Respondent has determined that the tractors and trucks had a useful life of 6 years and the tank trailers a useful life of 10 years. The tank trailers were acquired in 1954 for the purpose of refueling the tractors at Riss & Company's various terminals throughout its territory. However, due to operational difficulties not related to their useful life petitioner abandoned their use, for the most part, after 1956. As to Oklahoma-Colorado the only depreciation issue relates to the useful life and salvage value of the 36 trailers which that company leased to Riss & Company over the 1952-1953 period. These trailers had been acquired in prior years dating back to 1947. Oklahoma-Colorado claimed depreciation on them based on a useful life of 5 years for the new and 3 years for the used trailers, and a salvage value of 10 percent of cost. Thirty-three of the 36 trailers were sold *169 to Fruehauf in 1954 along with the 771 trailers sold to Fruehauf in that year by T.M. & E. All of the 33 trailers had been fully depreciated down to salvage value at the time of their sale to Fruehauf. In his determination of the allowable depreciation deductions on the trailers, respondent used a salvage value equal to the sale price of the trailers to Fruehauf in 1954, the same as for the trailers sold by T.M. & E. These trailers were of the same general type and were subjected to the same usage as the T.M. & E. trailers. Opinion The depreciation allowable on assets used in a trade or business depends on the usage and condition of the equipment over the period of its normal use by the taxpayer and its estimated resale or salvage value at the end of such usage. See Massey Motors v. United States, 364 U.S. 92. Except as to certain specific items, the evidence before us contains little information about the actual use of much of the equipment involved or its physical condition or resale value in any of the years under review; and those factors are not relied upon to any great extent by petitioners. Regarding respondent's depreciation adjustments in general, petitioners *170 argue, with reference to Rev. Rul. 90, 1953-1 C.B. 43, [6] and Rev. Rul. 91, 1953-1 C.B. 44[7] that respondent has the burden of proving a reasonable basis for his depreciation adjustments and has failed to do so. They state in their brief: We submit that until there has been shown by respondent "a clear and convincing basis for any adjustments" that respondent has not complied with the duty resting on respondent. This is one portion of the case where the burden is on respondent as opposed to being on petitioners. *171 Petitioners apparently misconceive the import of the cited rulings. As pointed out by respondent, the rulings are declarations of Internal Revenue Service policy, intended for administrative guidance and are not rules of law. They in no way affect the statutory burden of proof imposed upon petitioners with respect to the present depreciation issues. The burden of proving the facts necessary to sustain their depreciation claims rests on petitioners and not on respondent. See M. Pauline Casey, 38 T.C. 357 (1962). As to all items in controversy except those specifically dealt with herein, respondent's determination of petitioners' allowable depreciation is sustained. As to Riss & Company, we have found on the evidence of record that the 99 Corbitt tractors and 75 Dodge trucks, acquired by petitioner in 1950 and 1951, had a useful life of 5 years and a salvage value of 10 percent of cost. The only dispute as to the refrigerating units, the only other Riss & Company item in dispute, is whether depreciation should be computed on the basis of a useful life of 6 years, as respondent has determined, or 3 years, as claimed by petitioner. No question has been raised as to *172 what if any salvage value the units might have had at the end of their useful life. The evidence is that the refrigerating units would not function satisfactorily; that they were too small for the trailers in which they were installed; and that the trailers themselves were improperly insulated, causing the units to work overtime. Some of the units were not used all of the 3 years of their ownership by Riss & Company. In the absence of proof of any economic conditions or other circumstances which might have enhanced the resale value of the units, the fact that Riss & Company was able to sell them in 1957, after they had been in use for approximately 3 years, under somewhat adverse conditions, at more than half their original cost, indicates a useful life of at least 6 years as determined by the respondent. In any event, there is not sufficient evidence as to the actual use of the units and their condition at the time of sale by petitioner to establish a 3 year useful life, as claimed by petitioner, or to overcome the presumptive correctness of respondent's determination of a useful life of 6 years. T.M. & E. makes the same argument as Riss & Company that respondent has the burden *173 of proof in respect of the depreciation adjustments and that he has failed to offer clear and convincing evidence to support his determination. As pointed out above, this argument is unavailing. Respondent contends that T.M. & E.'s depreciation on the 1,200 trailers should begin not at the time when they were invoiced by T.M. & E. but when they were actually put into service by Riss & Company. He cites section 1.167(a)-10(b), Income Tax Regs, [8] and among other cases Massey Motors, Inc., supra.
As we see it the question here does not challenge the correctness of the regulations fixing the beginning of depreciation at the time the asset is placed in service. Obviously, the regulation refers to the time when the asset is placed in service by the owner. The owner here was T.M. & E., not Riss & Company. T.M. & E.'s only use of the equipment was its lease to Riss & Company, therefore it was placed in service by T.M. & E. on the effective dates of the lease agreements which correspond with the dates of the invoices. These were the dates on which *174 Riss & Company began the rental payments to T.M. & E. As lessee Riss & Company put the equipment into its own service at its own convenience and in the best interests of its own business. The evidence is that the equipment was all ready for service and placed at the disposal of Riss & Company at the time it was invoiced to T.M. & E. We think that T.M. & E. correctly used the dates of the invoices for the commencement of depreciation. As to the 50 Diamond T tractors and 16 G.M.C. trucks, the evidence fails to show a useful life of less than that of 6 years as determined by respondent. There is evidence that the use of the 16 tank trailers was discontinued after a few years because of certain operational difficulties not related to their useful life. However, there is no evidence on which we can find that their useful life was less than 10 years, as determined by respondent. T.M. & E. contends that the reasonably estimated salvage value, in the years prior to 1954, of the used trailers sold to Fruehauf was considerably less than their sale price to Fruehauf, which was the salvage value used by respondent in computing depreciation for all years prior to 1954. The evidence we think *175 supports that contention. Most of the trailers were of the 32 foot length type, which at the time of their sale to Fruehauf were becoming obsolete for long distance motor freight transportation and were rapidly being replaced with the longer 35 foot trailers. The evidence is that the saving resulting from this comparatively small increase in payload capacity was a vital profits factor in long-haul transportation. Most of the state laws had authorized the use of the larger trailers on their highways and the motor freight industry was rapidly converting to their use. The reason for Fruehauf's willingness to pay more than a normal salvage price for the trailers was due in large part to the demaed for the short trailers resulting from the development by the railroads of the "piggy back" method of freight transportation, where loaded trailers would be placed on freight cars and transported by rail to the area of their destination. The standard freight car would accommodate two of the 32 foot trailers but not two of the newer 35 foot length. The Korean conflict and the resulting demand for transportation, and also the scarcity of transportation facilities, had boosted the price of all *176 used trailers and tractors. Respondent now concedes that the acquisition of the used trailers by Fruehauf was a purchase and not a trade allowance on the new trailers purchased by T.M. & E. in 1954, as he determined in his notice of deficiency. On its part, T.M. & E concedes that under the Cohn rule ( Cohn v. United States, 259 F. 2d 371) it is not entitled to any depreciation deductions on those trailers in 1954, the year of their sale. Since the respondent has made no adjustments with respect to the useful life of the trailers, the question of salvage value is the only one to be determined. On the evidence as a whole, we find that the reasonable salvage value of the 771 trailers, to be used in computing T.M. & E's depreciation deductions for the years prior to 1954, was 10 percent of their cost. As to Oklahoma-Colorado the only depreciation question presented is the salvage value of the trailers which it sold to Fruehauf in 1954. We have held above that the sale price of the trailers to Fruehauf in 1954 did not reflect their true salvage value in prior years and that for the purpose of computing depreciation for the years prior to 1954, a salvage value of 10 *177 percent of cost should be used. We so hold with respect to the 33 trailers owned by Oklahoma-Colorado. Oklahoma-Colorado concedes, as does T.M. § E., that under the Cohn rule it is not entitled to any depreciation deduction in 1954 on the trailers in that year. Issue 3 (V) The following issues numbered 3 to 16, inclusive, relate to Riss & Company only. Business Expenses - Reimbursement to Riss, Sr. Findings of Fact In each of the years 1952 to 1956, inclusive, Riss, Sr., was reimbursed by Riss & Company for amounts which he had allegedly spent on the company's behalf for travel, entertainment and other purposes. He kept no record of such expenditures and did not submit itemized statements to Riss & Company. His account was set up in Riss & Company's books as follows: Kansas City
Estimated
Club
Other
Total
Year
Expenses
Expenses
Expenses
Expenses
1952
$11,861.20
$6,966.90
$7,178.90
$26,007.00
1953
11,430.00
6,247.50
5,729.50
23,407.00
1954
8,825.00
7,419.91
1,755.09
18,000.00
1955
9,700.00
6,235.11
9,539.89
25,475.00
1956
10,000.00
3,576.80
7,994.20
21,571.00
Respondent has disallowed approximately 75 percent *178 of the above amounts claimed as "estimated expenses" and "Kansas City Club expenses," but has allowed the deduction of all of the "other expenses," which consisted of payments made by Riss & Company on bills submitted directly to it by various restaurants, hotels, clubs and other establishments. He has included the disallowed estimated expenses and Kansas City Club dues in the personal income of Riss, Sr., and this adjustment also is an issue in these proceedings. Riss, Sr., had been a member of the Kansas City Club for many years. He maintained one or more rooms at the club for the use of himself and guests during the 1952-1955 period, and made his residence there from time to time when in Kansas City. Opinion There is no evidence before us on which we can determine what portion of the amounts withdrawn by Riss, Sr., were used for the benefit of Riss & Company. Riss, Sr., kept no records and made no accounting for the monies which he withdrew from the company and he was unable to testify on these matters from memory. It may be that some of the amounts in dispute were spent in furtherance of the business of the company and were, in a general sense, ordinary and necessary business *179 expenses, but we have no way of determining whether it was more or less than found by respondent. It is argued by petitioner that while the amounts withdrawn by Riss, Sr., and claimed as expense deductions are not fully substantiated, they did not exceed the expense accounts of the other officers of the company, which respondent has not questioned, and should therefore be allowed. This argument is, of course, unavailing. Each officer's expense account must stand on its own. We have no means of establishing a reasonable comparability between the accounts of the different officers. Welch v. Helvering, 290 U.S. 111. It was incumbent on petitioner to furnish proof of the nature of the disallowed expenditures and their relationship to the company's business. Petitioner has failed to do this and perhaps, without adequate records, was unable to do so. Respondent's determination is therefore sustained. See Lucien I. Yeomans, 5 T.C. 870. What has been said of the estimated expenses and club expenses also applies to certain hotel bills incurred by Riss, Sr., which respondent has disallowed in whole or in part. The parties have stipulated that some of these are *180 deductible and some are not. As to those still in issue, respondent's determination is sustained. Issue 4 (VI, XLIV) Gifts Made by Riss & Company to Park College. Findings of Fact During the years 1952 and 1953, Riss & Company made cash payments to Park College in the respective amounts of $50,000 and $75,000 and in 1953 transferred to the college 50 shares of stock of a corporation for which it had paid $5,000. It deducted those amounts in its returns for those years as charitable gifts. Respondent has determined that the payments to Park College were not gifts but were part consideration for land which Riss, Sr., purchased from the college in furtherance of a project to build a lake and develop the adjacent land in the area. Respondent has stipulated that bona fide gifts to Park College would be deductible. Early in 1953 Riss, Sr., and Kay McAuliffe formed a partnership known as "Lake Project," for the purpose of developing real estate, each contributing $5,000 in cash. They contemplated building a lake in an area near Park College and selling home sites along the lake shores and adjacent area. Kay McAuliffe had been engaged in the real estate business in the Kansas City *181 area for some time and had previously assisted Riss, Sr., in the purchase and sale of properties. The partnership filed income tax returns for each of the years ended March 31, 1954, 1955 and 1956, in which it stated its business as "promotion of sales for lake resort real estate." It did not report any income in those years, but claimed losses, consisting largely of automobile expenses, depreciation, and insurance, amounting to $1,023.23 in 1954, $1,230 in 1955, and $756.08 in 1956. The site picked for the lake included an undeveloped wooded ravine, the greater portion of which was owned by Park College. Negotiations for purchase of the land were begun in 1952. By contract dated April 8, 1953, Park College agreed to sell to Riss, Sr., up to 300 acres of the lake site property for $50 per acre and such additional acreage as might be desired for $100 an acre. After work was begun on the project, it was found that the dam as designed encroached on other adjacent land known as the "Powell Tract." The Powells offered to sell the property, consisting of about 18 acres, to Riss, Sr., for $20,000, but he was unwilling to pay that price. Park College was anxious to have the project completed *182 and agreed to purchase the Powell Tract for $20,000 and sell to Riss, Sr., as much of it as might be needed for the lake at the same price of $50 per acre. Park College purchased the property by deed dated August 27, 1953, and sold a portion thereof to Riss, Sr., in that year. Altogether Riss, Sr., purchased from Park College approximately 515 acres for a total stated price of $36,531.60. The records of Park College show that at January 12, 1953, it owned 517.6 acres of land in the lake development area of a book value of $88,184.24 and an appraised value of $47,873.26. On June 11, 1953, Riss & Company purchased 50 shares of common stock of Down Town Redevelopment Corporation, Kansas City, Missouri, for $5,000 and had the stock registered in the name of Board of Trustees of Park College. Opinion While there is evidence establishing that Riss & Company's gifts to Park College were in some way connected with Riss, Sr.'s purchase of the lake site land from the college, we do not regard this evidence as disproving the charitable nature of the gifts or the donative purpose on the part of Riss, Sr., or Riss & Company. It is shown that the college authorities were anxious to have *183 the lake project developed because they felt that it would be a great benefit to the college, in that the college retained acreage in the area and retained access and recreation rights as to the lake. We feel that these were factors affecting the sale price of the land to Riss, Sr. Under respondent's theory that the payments to the college were part consideration for the land the total cost of the 515 acres of land to Riss, Sr., was over $166,500, the sum of the alleged gifts plus the actual purchase money payments. However, the value which respondent has asked us to find for the land is only $103,300. It is unlikely that Riss, Sr., would have been willing to pay, or that the college would have asked him to pay, more than $60,000 in excess of actual value for land which the college was anxious for him to acquire and develop. On the evidence as a whole, we think that the donative intent was the dominant motive for the gifts and that respondent erred in disallowing the deductions claimed. This ruling, that the gifts to Park College by Riss & Company are deductible as charitable contributions, disposes of the further issues presented in Riss, Sr., Docket No. 74954, as to whether *184 those amounts are taxable to Riss, Sr., as payments for land purchased by him from Park College for the lake project. Issue 5 (VII) Canadian Lodge-Percentage of Business Use. Findings of Fact In 1952 Riss & Company purchased an island located in the area of Sioux Lookout, Ontario, Canada, on which it constructed and equipped a fishing and hunting lodge. Title to the property was taken in the names of Richard and Robert Riss, who held it in trust for Riss & Company. The lodge was of log construction. It contained sleeping accommodations for about 12 guests; a kitchen, a dining room, a storage room, a large centrally located fire place and a porch. There was also a boat house adjacent to the lodge, with bedrooms overhead. The equipment included a 25 foot Richardson cruiser, several small fishing boats, and a Norseman airplane which was kept at the lodge for the use of guests. Petitioner also had a DC-3 airplane, which it used from time to time to transport guests to and from the lodge. The lodge was acquired and was operated by Riss & Company chiefly as a public relations adjunct of its business and as a vacation resort for its officers, employees, sales representatives *185 and customers. E. E. Peck, petitioner's vice president in charge of sales, was assigned the job of arranging and coordinating the visits of guests to the lodge. Usually, petitioner's sales staff, field executives, and its sales and terminal personnel were flown into the lodge every summer in groups of about a dozen for a week's vacation. A schedule was drawn up by Peck allocating a certain time to each metropolitan area. The use of the lodge for these purposes was somewhat curtailed in 1954 because of an investigation initiated by the Interstate Commerce Commission to ascertain whether it was being used to effect a rebate to the shippers. Some members of the Riss family and their personal friends occasionally visited the lodge. Other guests included the governor of the State of Kansas and other state officials, labor union officials, and bankers with whom Riss & Company did business. The Canadian lodge and its facilities were used 75 percent for business purposes and 25 percent for non-business purposes. Respondent has determined that the Canadian lodge was operated for business purposes to a limited extent and has allowed 25 percent of the deductions claimed as operating expenses *186 and depreciation on the lodge and its equipment. Respondent also determined that certain expenditures charged to operating expenses of the lodge were capital expenditures. He further determined, however, that the expenses in connection with the operation of the Norseman airplane at the lodge and the DC-3 airplane used to transport guests to and from the lodge were deductible to the extent of 75 percent of the total amounts claimed. Opinion Respondent and petitioner have now settled by stipulation all of the issues pertaining to the operation of the lodge except the amount of operating costs properly allowable as ordinary and necessary business expenses. The evidence shows, to our satisfaction, a much greater use of the lodge for business purposes than determined by respondent. A reversal of respondent's percentages of 25 percent business use and 75 percent nonbusiness use would, we think, give a more accurate result. Respondent has recognized that 75 percent of the cost of operating the two airplanes, one of which was used exclusively at the lodge, was for business purposes. We think that percentage should also be applied to all of the lodge expenses. The evidence establishes *187 a proximate relationship between the entertainment of a large portion of petitioner's guests at the lodge and its business. See Challenge Manufacturing Co., 37 T.C. 650. Issue 6 (XI) Payment of $38,000 to Division of Employment Security, State of Missouri - Whether Deductible. Findings of Fact At about the close of 1953, or early in 1954, Riss & Company made a voluntary payment of $38,000 to Missouri Unemployment Compensation Fund. The payment was in response to a notice from the Division of Employment Security, dated December 15, 1953, stating that the company's contribution rate for the year 1954 would be 1 percent, but that the cost could be reduced to zero by a voluntary contribution into the fund of an additional amount which petitioner might determine on an analysis of its employees' experience rating. Petitioner determined that this amount would be approximately $38,000. It then had a credit balance in its existing account of approximately $134,745. The notice to petitioner from The Division of Unemployment Security stated, "voluntary payments for use in calculating 1954 contribution rate may be made on or before January 15, 1954." Petitioner's check *188 for $38,000, payable to the Unemployment Security Fund, was written and dated December 31, 1953, and was recorded in the company's books on that date under the notation "to reduce 1954 rate to zero," but was not mailed until January 4, 1954. On January 4, 1954, Riss & Company's assistant treasurer wrote a transmittal letter to the Division of Employment Security, enclosing the check, and the amount was claimed as a deduction in the petitioner's return for 1953. Respondent has determined that the payment is deductible in 1954 rather than in 1953. Opinion Obviously, the actual payment of the $38,000 to The Missouri Unemployment Compensation Fund was not made in 1953. Although the check was dated December 31, 1953, it was not placed in the mail until January 4, 1954. Neither was the amount in question properly accrued in 1953. As an accrual taxpayer, petitioner was entitled to accrue in 1953 the liabilities which became fixed and payable in that year. We said in Champion Spark Plug Co., 30 T.C. 295, affd. 266 F. 2d 347 (C.A. 6), that the accrual of an expense as a deduction is dependent upon the existence of a fixed and definite obligation to make such *189 payment in the taxable year when the deduction is sought. See also United States v. Anderson, 269 U.S. 422. Petitioner was under no fixed and definite obligation, or commitment, to make the payment in 1953 and none was created by the mere act of one of its officers of writing the check and entering the amount in its books in that year. Petitioner cites I. R. Mim. 4595, 1937-1 C.B. 63; Special Ruling October 12, 1944, 454 CCH par. 6091, 5 P-H sec. 76,099 (1945); and Rev Rul. 55-452, 1955-2 C.B. 38. I. R. Mim. 4595 provides that employee's contributions "required by the State to be paid into State unemployment funds" are deductible "for the taxable year in which they are paid or accrued." Petitioner's $38,000 contribution to the fund was not required by the laws of the State of Missouri, either in 1953 or 1954. It was a voluntary contribution and was so described. Petitioner had no accruable liability for the contribution in that year. Special Ruling of October 12, 1944, is as follows: Missouri Unemployment Compensation Fund contributions: Deductibility by employers. - Contributions made by employers to the Missouri Unemployment Compensation *190 Fund under Secs. 9427(e) and 9427(k) of the Missouri Unemployment Compensation Act, as amended, are deductible as business expenses where payment is made for the bona fide purpose of securing a reduction in rate at a time when it is necessary to make such payment in order to secure the reduced rate for the current or immediately succeeding year and is not for the purpose of increasing the reserve so as to effect a reduction in rate or the maintenance of a low rate in future years. The fact that the amount paid by the taxpayer pursuant to such intention is insufficient to accomplish a reduction in rate, or is in excess of the amount required, will not affect the deductibility of the amount paid. The ruling has no particular application here. It relates generally to the deductibility of contributions made "at a time when it was necessary to make such [payments] in order to secure the reduced rate for the current or immediately succeeding year." It was not necessary for petitioner to make the payment in 1953 in order to secure the reduced rate for 1954, nor did it do so. The notice sent petitioner by the Division of Employment Security stated that the payment "may be made on or before *191 January 15, 1954." Rev. Rul. 55-452, 1955-2 C.B. 38, 39, supports respondent's position here rather than that of petitioner. It was there held that: [Where] a lump sum payment is made voluntarily into the Wisconsin unemployment reserve fund by a cash basis or accrual basis taxpayer to effect a reduction in the unemployment insurance rate, which reduction is applicable to the calendar year subsequent to the year in which paid, the amount thereof nevertheless, is deemed to have been incurred as a business expense in the taxable year in which paid and is deductible in such year, under section 162(a) of the Internal Revenue Code of 1954 (section 23(a) of the Internal Revenue Code of 1939). Where a payment, for accomplishing the stated purpose, is made in January after the close of a calendar year, even though it shall be credited to the employer's account as of the preceding December 31, and shall be considered as having been required, under the Wisconsin law, nevertheless the amount thereof will constitute an allowable deduction, for Federal income tax purposes, under either the cash or accrual basis of accounting, in the taxable year in which *192 paid. * * * Respondent's determination that the payment of $38,000 to the Division of Employment Security is deductible in 1954 rather than 1953 is sustained. Issue 7 (XII) Business Expenses - Payments to Motor Carrier Engineering Service for Inspection of Highway Equipment. Findings of Fact As of January 1, 1952, Riss & Company entered into an agreement with Julian Jumper, operating as Motor Carrier's Engineering Service, hereinafter referred to as Motor Carriers, with offices at Wichita, Kansas, under which it was to pay Motor Carriers $1,200 per month for certain road engineering services described in the contract as follows: WHEREAS, Riss & Company, Inc., is desirous of obtaining road engineering service in the states of Kansas, Missouri and Oklahoma, and the Motor Carriers Engineering Service is able and willing to perform this service for Riss & Company, Inc., it is agreed that Engineering Service will submit a report of each truck inspected or observed on the highway reflecting the engineer's observation of the operation of that truck. Engineering Service will patrol the highways over which Riss equipment is operating, enforcing adherence to Interstate Commerce *193 Commission and state regulatory regulations and Company rules. Riss & Company, Inc., will pay Engineering Service for this service at the rate of Two Thousand ($2,000) Dollars per month. It is also agreed that Engineering Service will provide passenger cars in order to perform this service which vehicles Engineering Service will fully maintain. Riss authorizes Engineering Service to stop Riss vehicles on the road and make reasonable inspection of the equipment and the driver. All drivers discovered in violation of regulations, either Interstate Commerce Commission, State or Company, will be instructed to comply immediately. Any truck carrying an unauthorized passenger will be stopped and the passenger removed therefrom; also, any driver operating a truck while under the influence of intoxicants will be removed from the truck immediately and the nearest terminal advised. Julian Jumper was the husband of one of the sisters of Riss, Sr.; two of his (Jumper's) nephews were associated with him in Motor Carriers. During 1952 and 1953 Jumper was a full-time employee of Bocing Aircraft Company, Wichita, Kansas. One of his associates in Motor Carriers, Melvin Blakership, was president of *194 the Aluminum Awning Sales Company, Wichita, Kansas, during the entire 1952-1953 period. Several hundred inspection reports were submitted to petitioner by Motor Carriers each month during the term of the contract. The reports were not kept by petitioner but copies of them were kept by Motor Carriers. These were inspected by respondent's special agents, and some of them were found to be dated and signed by Jumper at a time when he was regularly employed at Wichita, Kansas, and at points many miles distant from his place of employment. Road inspection service of the nature of that described was not uncommon in the motor transportation industry. Its purpose was to keep the equipment properly maintained and operating in an economic manner and in accordance with the rules of the Interstate Commerce Commission and the traffic laws of the various states. There were several concerns performing such services for petitioner in other sections of its territory during this period. Petitioner also had several patrol cars of its own employed in road inspection of its transportation equipment. As provided in their contract, petitioner paid to Motor Carriers $24,000 in each of the years 1952 *195 to 1955, inclusive, and claimed the deduction of such payments as ordinary and necessary business expenses in its returns for those years. Respondent has disallowed the deduction of the amounts claimed as not constituting ordinary and necessary business expenses. Opinion Respondent's determination that the payments in question were not deductible as ordinary and necessary business expenses put petitioner on its proof not only that such expenditures were actually made but that they were, in the common sense of the terms, both ordinary and necessary. Welch v. Helvering, supra. Respondent's position is that the disputed payments were made not primarily for the purpose of benefiting petitioner's business but in furtherance of Riss, Sr.'s plan of distributing petitioner's profits to members of the Riss family, in this instance his sister, in the guise of business expenses. Although this was not given as a reason for the disallowance in the deficiency notice, we may reasonably assume that respondent's position was well known to petitioner and that in challenging the disallowance petitioner undertook the burden of proving contra distinguishing facts. The above findings *196 of fact contains substantially all of the pertinent facts disclosed by the evidence, as requested by petitioner in its brief. The evidence does not show what specific services were performed by Motor Carriers or of what benefit, if any, such services were to petitioner. On the contrary, the evidence is that no use was made of the inspection reports submitted to petitioner by Motor Carriers. An examination by revenue agents of a sample of the reports, picked at random, indicated that a substantial number of them were entirely fictitious. The evidence is amply sufficient to give color to respondent's determination that the payments in dispute were not compensation for services rendered to petitioner. The evidence further shows that neither Jumper nor his associates had had any experience in the field of motor vehicle inspection at the time petitioner and Motor Services entered into the contract, and there is no evidence that any of them were in any way qualified for such work. In fact, there is no evidence, other than the copies of the reports themselves, that any inspections were ever actually made. In any view of the evidence it falls far short of meeting petitioner's burden *197 of proving that the expenditures in question were ordinary and necessary business expenses. Issue 8 (XIII) Business Expense - Payment into Reserve for Contingent Liabilities Under Insurance Contract. Findings of Fact On December 7, 1953, Riss & Company purchased from Transport Indemnity Company of Los Angeles, a stock insurance company, hereinafter referred to as the Insurance Company, an insurance policy covering liability for personal injury and property damage for the period August 1, 1950, through December 31, 1953, for a total premium of $20,000. Also, on December 7, 1953, petitioner and the Insurance Company entered into a collateral agreement which provided in part that: (3) No final accounting shall be made until all Incurred Losses have been disposed of. (4) If the policy or policies to which this Agreement is applicable are terminated and if the "Formula for Determining Earned Premium Charges" applied to the entire period during which such policies were in effect produces a Deficit then such Deficit shall become due and payable to the Company. (5) If after any final accounting between the Insured and the Company there develop incurred losses which were unknown *198 at the time of such accounting the Insured agrees to reimburse the Company in the amount developed by application of the "Formula for Determining Earned Premium Charges" as herein stated. "Earned premium charges" were defined in the agreement as "the insured losses and loss expenses plus a 10 percent Company fee." On December 23, 1954, an agreement was entered into by petitioner, party of the first part, the Insurance Company, party of the second part, and National City Bank and Trust Company, Kansas City, Missouri, party of the third part, which contained, among others, the following provisions: I First Party shall from time to time deposit or cause to be deposited with Third Party an amount of cash equal to the reserve requirements as determined by First Party to be reasonable and necessary, and in any event finally adequate, to pay incurred losses and loss expense with respect to the liability insured by Second Party's Policy No. S-501. The deposit so made shall be credited to "Riss & Company, Inc. PL and PD Account", and the fund so deposited shall be withdrawn by First Party only for the payment of claims and claim expense, and the withdrawal of excess reserves established *199 for particular losses, which payments or withdrawals shall be made by drafts on the faces of which shall be designated the purpose of the payment, with reference to a particular claim file numerically identified by First Party, and such drafts shall bear the duly authorized signature of First Party. Copies of drafts shall be mailed promptly to Second Party. The withdrawal of any amount or the payment of any claim in excess of Five Thousand Dollars ($5,000.00) shall require the duly authorized counter-signature of Second Party in addition to the duly authorized signature of First Party. A certified copy of the corporate resolution covering authorized signatures of First Party, and authorized signatures therefor, shall be furnished to Third Party. II Second Party shall furnish to Third Party its duly authorized signatures for all drafts requiring Second Party's countersignature, and shall furnish to Third Party a certified copy of the corporate resolution authorizing such signatures. III Third Party shall set up on its books an account known as "Riss & Company, Inc. PL and PD Account." Duplicate deposit slips for all deposits made by First Party will be mailed promptly to Second *200 Party. Drafts on said account in an amount of Five Thousand Dollars ($5,000.00) or less will be paid by Third Party if funds are available, from said account if signed by an authorized signature of First Party. Drafts on said account in excess of Five Thousand Dollars ($5,000.00) will be paid by Third Party from said account, if funds are available, only if signed by an authorized signature of First Party and countersigned by an authorized signature of Second Party. On the same date, December 23, 1945, the same three parties entered into a collateral agreement under which petitioner made a deposit of $131,000 in the "Riss & Company, Inc. PL and PD Account." This agreement contained the following provisions: I. First Party shall deposit with the Third Party the sum of One Hundred Thirty-One Thousand Dollars ($131,000.00), which amount has been determined by the First Party to be the amount necessary to liquidate pending claims and litigation (including expense incidental thereto) insured by the Second Party under its Policy of Insurance No. S-501. First Party agrees to deposit the sum of One Hundred Thirty-One Thousand Dollars ($131,000.00) and any additional sums of money for *201 the purposes stated in this Agreement to the credit of "Riss & Company, Inc. PL and PD Account" with the Third Party for the exclusive use of the payment of claims, litigation and claim expense to liquidate claims, litigation and expense insured by the Second Party under its Policy of Insurance No. S-501. II. First Party agrees at six-month intervals to submit to an examination and analysis of all claims and litigation remaining unsettled, covered by Second Party's Policy No. S-501 for the purpose of determining the adequacy of the amount on deposit with the Third Party to liquidate claims and litigation (including expense) for which the Second Party may be liable under its Policy of Insurance No. S-501. III. First Party agrees to increase its deposit with the Third Party for the purposes stated in this Agreement if the amount on deposit is insufficient to liquidate the claims and litigation, including claim expense. Second Party agrees the amount on deposit may be reduced by First Party if the amount on deposit exceeds the estimated cost of liquidating claims and litigation, including claim expense, covered by Second Party's Policy of Insurance S-501. IV. First Party may *202 draw drafts against this fund, subject to the terms, conditions, limitations and Exclusions of Policy of Insurance No. S-501 and the Agreement hereinbefore referred to dated December 7, 1953, with copies of drafts or checks being sent to the Head Office of Second Party at Los Angeles, California. V. Third Party shall set up on its books an account known as "Riss & Company, Inc. PL and PD Account". Duplicate deposit slips for all deposits made by First Party will be mailed promptly to Second Party. The PL and PD Account had credit balance of $126,124.44 at December 31, 1954, and $74,751.24 at December 31, 1955. None of the pending claims against which Riss & Company's deposit of $131,000 was made to its PL and PD Account had been settled at December 31, 1954, and the amount of such pending claims is not shown. In its books, petitioner set up an account entitled "reserve for public liability and property damage," to which the December 31, 1954 deposit of $131,000 was credited. There were two debits to the account on December 31, 1954, one for $1,447.82 and one for $3,427.94. In its return for 1954, Riss & Company claimed the deduction of the entire amount of $131,000 as a *203 business expense of that year. Respondent has limited the deduction to $4,875.76, the amount actually paid out of the account in 1954. Opinion Respondent's position is that the $131,000 deposit in the Riss & Company PL and PD Account in 1954 was a reserve to cover future expenses and not a deductible expense of that year. Petitioner contends that it was a payment to cover a deficit already determined in the account and is therefore deductible as an expense of 1954. What seems of most importance to us is that the $131,000 deposit was not an amount actually paid out by petitioner or even a determined liability of petitioner accruable in 1954. It was merely an amount deposited with the bank as trustee for both petitioner and the Insurance Company against the petitioner's contingent liabilities. It did not cover all of the contingent liabilities. If the fund proved insufficient petitioner was required to make additional deposits and if it was found to be greater than the actual liabilities petitioner could withdraw the surplus. Thus, all of the events which might have determined the petitioner's liability to the Insurance Company had not occurred at the end of 1954. See section 1.461-1(a)(2), Income Tax Regs. *204 , 1954 Code. Liabilities are to be reported by an accrual basis taxpayer when all the events occur which fix the amount of the liability and determine the taxpayer's obligation to pay it. United States v. Anderson, supra. The uncertainty of petitioner's liability in 1954 to pay any ascertainable portion of the deposit made to the fund justifies respondent's allowance of only the portion actually paid out in that year. Issue 9 (XIV) Business expense - Cost of Putting New Equipment into Operation Findings of Fact Riss & Company began putting into service in 1954 the new tractors and trailers which T.M. & E. purchased and leased to it in that year. The 1,200 Fruehauf trailers were delivered either at Memphis, Tennessee or Westfield, Massachusetts, the tractors were picked up at those points by Riss & Company's employees from time to time at its convenience. During 1954 and 1955 the petitioner incurred costs of integrating the new equipment into its operations and readying the equipment for road service, which it deducted currently as ordinary and necessary expenses as follows: Year
Purpose of Expenditure
1954
1955
Delivery of New Equipment
$142,201.09
$17,032.62
Painting of New Equipment
6,874.65
1,464.42
Bedding for New Equipment
7,962.19
8,343.91
Total
$157,037.93
$26,840.95
*205 The delivery expense included drivers hire and costs of tractor operations to and from the delivery points and petitioner's place of business. The painting was principally the placing of petitioner's name and emblems on the trailers. The bedding item was for mattresses, blankets, pillows and bed linen, placed in the tractor cabs for use of off-duty drivers on long distance hauls. Respondent determined that the costs of putting the new equipment into service were capital expenditures, which should be depreciated over a period of 8 years, and has allowed depreciation and amortization deductions in the amounts of $6,543.25 in 1954 and $22,425.72 in 1955. Opinion The rule is well settled that expenditures resulting in the acquisition of assets with a useful life of not more than one year are deductible annually as business expenses, and those relating to the acquisition of assets having a useful life of more than one year are capital expenditures to be added to the cost of the assets. May, Stern & Co., 20 B.T.A. 241, affd. F. 2d 1034; W. H. Tompkins Co., 47 B.T.A. 292; International Shoe Co., 38 B.T.A. 81. Such acquisition costs include freight *206 and drayage on merchandise acquired for resale. May, Stern & Co., supra.The rule applies to assets acquired by lessee for use on leased property. Duffy v. Central R.R., 268 U.S. 55; Journal-Tribune Publishing Company, 38 T.C. 733. We said in Journal-Tribune Publishing Company, supra, that, basically, a capital expenditure is one which "results in the acquisition of some property or benefit, the useful life of which extends beyond the current year - that is, which contributes to the production of income over a period beyond the current year." The expenditures in question here were not all of like character and do not necessarily require the same accounting treatment. The costs of transporting the tractors and trailers to the areas of petitioner's operations did not result in the acquisition by Riss & Company of any merchandise or property having a cost basis to which they could be added. These expenditures did, however, contribute to the production of income over the entire periods of the leases governing petitioner's use of the equipment. The same is true of the cost of painting petitioner's name and emblems on the equipment. *207 At any rate, it is not shown that the painting did not serve for the entire terms of the leases. As for the bedding for the tractors, the situation is different. There the expenditures did result in the acquisition of assets for use in petitioner's business, and the question is whether they were assets having a useful life of not more than one year, so that their cost would be deductible in the year when the property was purchased, or whether they had a useful life of more than oneyear, so that the cost must be capitalized. The evidence of record does not furnish sufficient facts for a determination of this question. There is testimony that the bedding was improperly cared for by petitioner's drivers and in some instances was stolen or misappropriated; but these circumstances did not affect its normal useful life. The loss from the theft of the properties, if substantiated, would have been recoverable through loss deductions. Respondent's determination that all of the costs of putting the equipment in service were capital expenditures and not ordinary and necessary business expenses is therefore sustained. However, we think that these costs should be amortized over the terms *208 of the leases under which Riss & Company had the use of the equipment. There was little likelihood that any of the benefits from these expenditures would extend beyond the terms of the leases. We do [*] know how respondent arrived at the [*] period over which he has spread the depreciation. Issue 10 (XVI) Business Expense - Attorneys' Fees and Expenses. Findings of Fact During the years 1952-1955, inclusive, Riss & Company paid to a Washington, D.C. attorney, Alvis Layne, fees and expenses amounting to $36,032.85 in 1952, $35,930.36 in 1953, $28,876.37 in 1954, and [*in 1955. It claimed the deduction of those amounts in its income tax returns as ordinary and necessary business expenses. The respondent determined that the payments were capital expenditures relating principally to the acquisition or [*] of certain operating rights issued by the Interstate Commerce Commission. Alvis Layne was a practicing attorney with offices in Washington, D.C. Sometime prior to 1952 he was engaged by Riss & Company to represent it in various legal matters, especially those before the Interstate Commerce Commission and other government agencies. Layne was engaged under a general retainer *209 contract and was to receive as his compensation a percentage, [*] percent, of the gross revenue of the company. The compensation of most of petitioners' top executives was determined in that manner, that is, a percentage of gross income. During some or all of the years 1952-1955, inclusive, Layne represented petitioner in matters before the Interstate Commerce Commission involving applications for and the preservation of operating rights in different areas of the country. Among these were the operating rights of Monarch Motor Freight System to all general commodities east of Chicago and St. Louis. Riss & Company acquired the Monarch Company in 1941 and thereafter operated under that company's authority. Other interested transportation companies objected to petitioner's succession to the Monarch rights and their protests were pending before the Interstate Commerce Commission. Petitioner had applications pending for permanent authority to operate under the rights of Monarch and other acquired companies between Chicago and St. Louis and the principal eastern seaboard cities. Also in 1952 petitioner held permanent rights to transport explosives between points west of Chicago and *210 St. Louis and temporary rights to transport explosives between certain eastern points. It had applications for permanent rights to haul explosives in the eastern territories which had been pending since 1952 and had been the subject of extensive litigation. The applications were finally denied about 1960, but petitioner continued to operate under its temporary rights throughout the 1952-1955 period. Also in 1952 petitioner had pending an application, later approved, to acquire Jarmin Transportation Company which had operating rights for motor freight transportation between Boston and New York and other intermediate points. Layne represented petitioner in all of the matters referred to above and other matters including rate hearings, criminal actions against petitioner, Interstate Commerce Commission investigations of petitioner's operations (including the operation of the Canadian lodge referred to above) and other matters not pertaining to the preservation or acquisition or franchises or operating rights. Layne did not participate in any of the legal matters handled normally by petitioner's general counsel. Opinion As a general rule the cost of acquiring a franchise or license *211 to do business, having a useful life of more than one year, for a determinable period are treated as capital expenditures. See Radio Station WBIR, Inc., 31 T.C. 803; Pasadena City Lines, Inc., 23 T.C. 34; Morris Nachman, 12 T.C. 1204, affd. 191 F. 2d 934. On the other hand expenditures relating to the operation or protection of an established business are ordinary and necessary business expenses. See Commissioner v. Heininger, 320 U.S. 467; Radio Station WBIR, Inc., supra; All States Freight v. United States, 72 F. Supp. 673. In the main, the service performed by Layne seemed to have been directed towards the promotion and operation of petitioners regular established business and the solution of recurrent problems commonly associated with the freight transportation business, rather than towards the acquisition of new franchises and operating rights. The cases relied upon by respondent, such as Radio Station WBIR, Inc., supra, are not controlling here. In that case the expenditures in dispute were incident to the acquisition by the taxpayer, which operated an AM-FM radio station, *212 of a license to construct and operate a TV station. We there said: Prior to the taxable year petitioner was engaged in the operation of an AM and an FM radio station. It was not engaged in the operation of a TV or television station and had no facilities for such an operation. Consequently the expenses incurred in 1953 for the purpose of acquiring a television construction permit and eventually a television license were not paid or incurred "in carrying on" a "trade or business" in which petitioner was then engaged so as to make such expenditures deductible as ordinary and necessary business expenses within the meaning of section 23(a). * * * and that: The record clearly indicates that petitioner's principal reason in applying for a television construction permit and incurring the expenditures involved was to enable it to enter into a new and improved field of broadcasting and to secure for itself the economic benefits expected to be derived from such an operation. * * * The expenditures here were more like those in All States Freight, Inc., supra. In distinguishing Radio Station WBIR, supra, from that case, we said: In the All States case, the taxpayer *213 was a common carrier conducting a trucking business over established routes, including interstate, and had been so engaged prior to the time it was required to obtain a certificate of public convenience and necessity from the Interstate Commerce Commission. The expenditures for which deduction was sought were therefore, as held by the court, incurred in defending its right to continue in the same business it had previously been engaged in and did not constitute an investment in new property. Petitioner had been operating under Monarch Motor System's rights since 1941, when it purchased that company. Layne was not employed for the purpose of acquiring Monarch's rights, or any other specific rights. He was not engaged to perform any specific services for Riss & Company. He was on a general retainer basis to handle a variety of legal matters before different government agencies, and the courts. His compensation was based not on services performed in these matters but on a percentage of Riss & Company's gross income. The amounts paid to him by Riss & Company were, we think, ordinary and necessary business expenses deductible in full in the years when paid. Issue 11 (XVII, XVIII) *214 Business Expenses - Reimbursements to Larry Quinn, Hotel Bill of Robert B. Riss Findings of Fact In its return for 1954 Riss & Company deducted as a business expense a payment of $1,870.17 to its vice president, Larry Quinn, to reimburse him for monies allegedly spent on behalf of the company, and a hotel bill of $920.31 incurred by its president, Robert B. Riss. Respondent disallowed the deductions for lack of substantiation of business purpose. Larry Quinn, now deceased, was a brother-in-law of Riss, Sr., and one of the founders of Riss & Company. The hotel bill was incurred by Robert B. Riss at the Ambassador Hotel, Los Angeles, California, in November 1954. He and several other representatives of Riss & Company were in Los Angeles attending a convention of Motor Vehicle Administrators. In the course of the convention Robert gave a dinner party at which he catertained members from the state in which Riss & Company operated, and made a talk about Riss & Company's operations. One of the guests attending the dinner was the superintendent of the highway patrol for the State of Missouri. Opinion The only evidence offered by petitioner in support of its deduction for the *215 payment to Larry Quinn was the statement of Robert B. Riss that he, as president of the company, examined and approved the account along with others before it was paid. There is no evidence as to the purpose for which the alleged expenses were incurred by Quinn or as to the nature of the services performed by him. In support of the deduction petitioner argues that "no testimony was introduced during the trial to sustain the disallowance." The burden of proof with respect to this issue as with some of those discussed above rests on petitioner and not on respondent. In the absence of proof of error, respondent's determination is sustained. As to the hotel bill there is evidence that it was incurred for business purposes. The attendance at the convention of Motor Vehicle Administrators in Los Angeles by petitioner's president and other company executives was in furtherance of petitioner's business. Respondent's position is that the hotel bill was at least in part for the entertainment of state officials and that its allowance would therefore contravene public policy. The only state official identified as having attended the Riss & Company dinner was the superintendent of the highway *216 patrol for the State of Missouri. In its proposed findings of fact, petitioner does state that Robert entertained "state officials, including turnpike authority representatives" which is apparently the basis for respondent's contention. Respondent's proposed findings of fact do not identify any state officials. The statements contained in the proposed findings of fact are, of course, not in evidence. On the evidence of record and in the absence of the disclosure of any reasonable grounds for respondent's disallowance of the deduction, we find that the payment in question was an ordinary and necessary business expense. Issue 13 (XIX) (Issue 12 Has Been Eliminated) Bad Debts - Accounts of Jarman Transportation Company and Meredith & Hitchcock. Findings of Fact In 1953 Riss & Company charged off as uncollectable an account of $20,317.22 with Jarman Transportation Company, hereinafter called Jarman, for monies previously advanced to the company. Jarman operated motor freight lines between Hartford, Connecticut, Boston, Massachusetts, and New York City, and had an interline operation agreement with Riss & Company. In January 1952, Riss & Company acquired an option to purchase *217 all of Jarman stock and in April 1952 authorized the exercise of the option. At some date not disclosed by record, Riss & Company acquired the Jarman stock and thereafter operated under the Jarman rights. Its application to the Interstate Commerce Commission for those rights was finally allowed, in part, and disallowed in part. The disputed bad debt loss of $20,317.22 arose from monies said to have been advanced to Jarman by Riss & Company. The times and purposes of such advances are not shown by the evidence. Meredith & Hitchcock was another motor freight operator in the area of Pennsylvania and New York, with whom Riss & Company had an interline agreement. In 1953 Riss & Company charged off $10,631 as a worthless debt of that company, which respondent allowed to the extent of $3,270.85. In 1955 Riss & Company reported as income $1,418.90 collected on the indebtedness and respondent has allowed Riss & Company a further deduction of that amount. Opinion Petitioner argues that both of the amounts in dispute were charged off as worthless debts after they had been determined to be uncollectable in accordance with petitioner's regular accounting practices and should therefore be *218 allowed. On the evidence presented there is totally lacking the necessary facts for a determination, either that the amounts in question were debts owing to petitioner at the close of 1953 or that they became uncollectable during that year. In the absence of such evidence, respondent's disallowance of the deductions is sustained. Issue 14 (XX) Business Expenses - Compensation Paid to Carlos P. Romulo. n8a Findings of Fact In its returns for the years 1952-1955, inclusive, Riss & Company deducted the respective amounts of $2,610.82, $6,250.25, $4,780.88 and $4,955.16 as expenses paid to Carlos P. Romulo, 8a its Washington, D.C. representative. Romulo 8a was described as a "solicitor," or public relations representative, employed to aid petitioner in acquiring new business with various departments and agencies of the United States Government and private concerns in the general vicinity of Washington. He was paid a salary, which is not in dispute here, and given a limited expense allowance. The above stated amounts represent expenses paid to him on vouchers which he submitted to petitioner in the years indicated. Following is a partial list of the vouchers submitted to and *219 paid by petitioner for the year 1953: Date
Amount
Explanation
12/ 7/53
$225.00
Advertising, Christmas
12/ 7/53
180.00
Advertising, Christmas cocktail party
12/29/53
63.75
Lunches, Navy - Marine - U.S. Air Force
12/23/53
130.50
U.S. Marine Corps
11/25/53
200.00
Advertising, Christmas
12/ 2/53
85.00
U.S. Navy Ordnance
11/27/53
50.00
Guests, Navy and Marine
Corps
11/17/53
50.00
Guests, Navy - U.S. Treasury Department (Bureau
of the Mint)
11/17/53
223.68
Army Zone Office
11/17/53
50.00
U.S. Navy
11/10/53
604.03
Navy - Coast Guard - Army - Atomic Energy Post
Office
9/25/53
118.60
Coast Guard - General Services, U.S. Treasury
9/25/53
61.69
Navy
10/ 8/53
52.30
Navy - Marine Corps
10/ 8/53
93.48
U.S. Treasury
8/31/53
84.27
U.S. State Department - Navy
8/27/53
81.52
Navy
8/27/53
154.86
U.S. Treasury - Navy
8/11/53
126.50
Cocktail party for General
Besson
7/13/53
500.00
$298.70 expense, Party for
Navy Personnel, Virginia
Beach
7/13/53
46.20
Navy
7/30/53
126.09
Navy RFC - General Services, etc.
7/17/53
143.68
Navy RFC - General, Services, etc.
7/10/53
90.13
Navy RFC - General Services, etc.
6/26/53
49.51
U.S. Treasury Office, Assistant Director, Bureau
of the Mint
6/ 9/53
75.78
Treasury - Navy - Marine Corps
5/29/53
34.83
Atomic Energy
5/22/53
50.00
General Services - U.S. Army
5/22/53
49.00
U.S. Marine Corps - Navy
*220 Respondent determined that the expenditures in question were of such character that their allowance as deductions would contravene public policy. Opinion The above findings contain substantially all of the facts requested by petitioner, or contained in the evidence, regarding the nature of the disputed expenditures. We do not know just what services were performed by Romulo n8a on petitioner's behalf. He did not appear as a witness at the trial and petitioner offered no proof, of these matters from other sources. The list and description of the vouchers submitted to petitioner by Romulo n8a for 1953, which is typical of those for other years, was taken from petitioner's records by examining revenue agents. They indicated that the expenditures were, for the most part, for entertainment of government officials or employees and members of the armed forces. For all *221 the evidence shows, it may well be, as respondent has determined, that the payments in question were for the purpose of influencing public officials and employees of the government and members of the armed services in obtaining business and were, therefore, illegal or, at least, in contravention of well defined public policy. See Commissioner v. Heininger, 320 U.S. 467; Lilly v. Commissioner, 343 U.S. 90; Rugel v. Commissioner, 127 F. 2d 393; Raymond F. Flanagan, 47 B.T.A. 782; Boyle, Flagg & Seaman, Inc., 25 T.C. 43. In any event, the absence of evidence on which we can determine the exact nature of the payments and their relationship to petitioner's business requires us to sustain respondent's determination that they are not deductible as ordinary and necessary business expenses. Issue 15 (XXI) Business Expenses - Legal Fees Findings of Fact In 1954 and 1955 Riss & Company claimed the deduction of legal fees, respectively, of $1,107.37 and $4,532.50 which respondent disallowed for reason that their deduction would be in contravention of public policy. Opinion Again, on this issue, petitioner has adduced *222 practically no evidence except its income tax returns for 1954 and 1955, which show nothing more than that such deductions were claimed. According to respondent's notice of deficiency the $1,107.37 was paid in connection with criminal charges brought against petitioner and the $4,532.50 was legal fees and fines resulting from operating with improper licenses. Petitioner's entire argument on brief is that: These attorneys' fees and expenses were in connection with the motor carrier activities of petitioner Riss & Company and were properly and currently deductible in the year of payment. See Commissioner v. Heininger, (1943) 64 S. Ct. 249, 320 U.S. 467, 47 B.T.A. 95. Without more facts as to the exact nature of the expenditures in dispute, it would be futile to undertake any discussion of the question of law on which petitioner seems to rely. For lack of proof of error, respondent's disallowance of the deductions claimed is sustained. Issue 16 (XXII, XXIII) Net Operating Losses for 1954 and 1955 - Carryback to 1952 and 1953 Findings of Fact In its returns for 1954 and 1955 petitioner, Riss & Company, reported net losses of $2,944,883.76 and $2,920,593.50, *223 respectively. Respondent has determined that the net losses did not exceed $52,926.49 in 1954 and $192,574.33 in 1955. It is stipulated that petitioner's net operating loss for 1954 is available as a carryback to 1952 for income tax purposes and 1953 for excess profits tax purposes and that the 1955 net operating loss also may be carried back for income tax purposes to 1953. Opinion It is petitioner's argument that its books and records were kept so as fairly to reflect its true net income, which was correctly reported in its returns, and that "respondent has completely failed to show that the returns do not property reflect true income." The only question presented for our determination here is the amount of petitioners net operating losses for 1954 and 1955. This, of course, must await computation under Rule 50 settlement in accordance with the stipulations entered into by the parties and our determination of the issues presented in these proceedings. In passing, however, we again point out that the burden of proof with respect to the 1954 and 1955 net operating losses rest not on respondent but on petitioner. The following issues numbered 17 to 34, inclusive, relate *224 to T.M. & E. only: Issue 17 (XXIX) Business Expenses - Payments to Kenneth B. Williams Findings of Fact In its return for 1951 petitioner claimed, and respondent disallowed, the deduction of $175 as attorney's fees paid to Kenneth B. Williams October 26, 1951. Opinion In addition to the above findings petitioner states in its proposed findings of fact that: The payment was actually made, was deducted by T.M. & E. during the calendar year 1951 as part of its legal and professional expense, although the officials of the corporation were not able at the time of trial to locate any supporting invoice or information concerning same. There are no other facts of record than those stated. Although it does not so state, petitioner may have intended to abandon this issue. In any event, for lack of evidence as to the true nature of the payment in question respondent's disallowance of the deduction claimed is sustained. Issue 18 (XXIX) Business Expenses - Payments to Marie Deny Riddle Findings of Fact Petitioner made payments to Marie Deny Riddle of $200 per month in 1949 in 1950 and 1951, and a $300 payment in 1952, which it deducted in its returns as ordinary and necessary *225 business expenses. Marie was the widow of A. J. Riddle, a former associate of Riss, Sr., in the Riss enterprises and was executrix of his estate. The deceased was one of the stockholders of A. J. Riddle, Inc., and after his death Marie acquired the ownership of 599 shares of the stock of that company. In 1947 or 1948 she sold the stock to T.M. & E. for $6,000. The sale was approved by the probate court April 29, 1947. The sale price of $6,000 was said not to represent the full value of the stock. In April 1948 petitioner's directors and stockholders approved the merger of petitioner and A. J. Riddle, Inc. and the liquidation of the latter company. Petitioner's payments to Marie began in May 1947. The first payment for $500 covered the period February 15 to April 30, 1947. According to petitioner's records the payments to Marie were to continue through February 15, 1952, for a total of $12,000. Marie was never an employee of petitioner. Opinion Petitioner has produced practically no evidence in support of its claim for the deduction of the payments in question. Its entire statement of facts consists of only two terse sentences. In its argument petitioner takes the position *226 that the payments to Marie were made pursuant to an oral agreement between Riss, Sr., and A. J. Riddle obligating T.M. & E. to "personally indemnify A. J. Riddle or his estate against any loss." The loss referred to, presumably, is any loss on the A. J. Riddle stock. The evidence contains no reference to such an agreement. On the evidence of record it appears that petitioner's payments to Marie may have been for her shares of A. J. Riddle, Inc., stock. There is no factual support for petitioner's deduction of the payments as ordinary and necessary business expenses. Issue 19 (XXIX) Business Expenses - Payments to S. A. Johnson Findings of Fact Prior to 1947 T.M. & E. operated a joint venture with S. A. Johnson involving the hauling of explosives from several ordance plants. The joint venture was terminated December 3, 1947. At that time Johnson was entitled to receive $48,454.33 but actually received only $15,000, leaving a balance of $33,454.33 which petitioner paid in the amounts of $7,123.28 in 1949, $12,000 in each of the years 1950 and 1951, and $2,331.05 in 1952. Respondent disallowed the deduction of the payments in the years 1949 to 1950, inclusive, as ordinary *227 and necessary business expenses of those years on the grounds that petitioner's obligation for the payments arose in 1947 and should have been deducted as an accrual of that year. Opinion Petitioner contends that the payments made to S. A. Johnson in the years involved were in satisfaction of a contractual liability "noncapital" in nature, which arose in 1947, but through inadvertence was not paid in that year. Respondent does not question the noncapital nature of the payments or petitioner's obligation to make them. His only grounds for disallowance of their deduction is that they are not expenses of the taxable years of which paid and claimed. Obviously, since petitioner's obligation for the payments became fixed and determined in 1947, as petitioner concedes, and since petitioner kept its accounts on an accrual basis, it should have accrued and deducted them in that year. Respondent's disallowance of the deductions in the subsequent taxable years is sustained. Issue 20 (XXIX) Business Expenses - Payment to Merriman Mortgage Company Findings of Fact In 1950 T.M. & E. paid $5,000 to Merriman Mortgage Company in consideration for the services performed by that company's *228 president and principal owner, Jack D. Merriman, in helping petitioner with its acquisition of a number of freight terminals during 1949 and 1950. Merriman had assisted petitioner in the selection of sites and the financing of several terminal buildings. Through his services the arrangements for financing were made with Western and Southern Insurance Company of Cincinnati, Ohio. Merriman acted as loan broker for that company and received a commission on the loans to petitioner. From time to time Merriman accompanied Riss, Sr., on trips to inspect the different terminal buildings and rendered services of considerable value to petitioner. Opinion Respondent determined that the $5,000 payment to Merriman was not an ordinary and necessary business expense but was a capital expenditure relating to the loans which petitioner obtained for acquiring its new terminal buildings. It is not claimed that either petitioner or Riss, Sr., was under any obligation to make the payment. According to the testimony of Riss, Sr., he had the payment made because he thought Merriman had given valuable assistance to him and to petitioner outside of the course of his regular services as broker for the insurance *229 company. There is no evidence that Merriman performed any services for Riss, Sr., or petitioner in matters other than the financing of the terminals. It is not contended that he was ever employed by petitioner or Riss, Sr., or had any contractual relationship with either of them. If the payment to Merriman was in fact for the services performed by him in obtaining the loans for construction of the terminal buildings, it was as respondent has determined, a capital expenditure which must be depreciated over the life of the loans or the buildings. See Detroit Consolidated Theatres, Inc., 133 F. 2d 200 (C.A. 6); Julia Stow Lovejoy, 18 B.T.A. 1179; Emil W. Carlson, 24 B.T.A. 868; Sayers F. Harman, 4 T.C. 335. If an outright gift it would not be deductible as a business expense. Respondent's disallowance of the deduction as an ordinary and necessary business expense is sustained. Issue 21 (XXX) Business Expense - Payments to William J. Stoud Findings of Fact In its returns for 1952, 1953 and 1954, petitioner deducted salary and travel expenses of an employee, William J. Stoud, as follows: Year
Salary
Travel Expense
1952
$ 1,252.00
$4,160.36
1953
16,553.00
2,454.85
1954
8,330.45
None
*230 Stoud was employed by petitioner in 1951 on a full-time fixed salary basis. He had previously been engaged by petitioner to build a terminal at Philadelphia which was completed in 1951. As an employee, Stoud's primary duties were to supervise the construction of petitioner's new buildings and the repairs and maintenance of those already in use. He also handled other matters for petitioner in an executive capacity and served generally as assistant to its president. He made numerous trips, sometimes with the president, on Company business. Opinion Respondent's notice of deficiency does not disclose any grounds for his disallowance of Stoud's compensation other than that it was considered of a capital nature, related to the construction of terminal buildings. It is not shown how the salary and travel expenses were allocated to the different terminals. The evidence, we think, supports petitioner's contention that Stoud's salary was an ordinary and necessary business expense. Owning and leasing terminals was a part of petitioner's regular business. Supervision of the construction and the maintenance of those terminals was for the best interests of that business. Stoud's services *231 to petitioner, however, consisted of more than that. The evidence is that he served generally as an executive of the Company and assisted the president in a variety of matters. Respondent has not made any allocation of the payments to the cost of construction and other services, nor is there apparent any reasonable basis for such an allocation. Respondent erred, we think, in treating the salary and travel expenses paid to Stoud in 1952, 1953 and 1954, as capital expenditures and not business expenses. Issue 22 (XXXI, XLVII) Business Expenses - Maintenance Costs and Depreciation on Residential Properties Findings of Fact During one or more of the taxable years 1949-1956, inclusive, petitioner was the owner of three residential properties located in one of the better residential sections of the Kansas City area, which were rented to and occupied by the members of the Riss family. The first property acquired was located at 6505 State Line, Kansas City. It was purchased by petitioner May 10, 1949, for a total consideration of $97,021.08, including $15,000 for the land, $70,000 for the house and $12,021.08 for furniture and fixtures. Petitioner made a down payment of $10,000 *232 and agreed to pay the balance of the purchase price over a period of 4 years. This property consisted of a 20-room residence, with 4 1/2 acres of land, lawn, trees and a swimming pool. Soon after the property was purchased petitioner authorized the real estate agent through whom the purchase was made to resell it for $125,000. During all the years 1950 to 1956, inclusive, the property was rented to Riss, Sr., for $300 a month. Following its purchase, and through 1956, the residence was occupied by Riss, Sr.'s former wife, Louise V. Riss, from whom he was divorced in July 1949 and their daughter, Louise V. Riss, II. Riss, Sr.'s son, Richard, also occupied the residence a part of that period. During the time of its occupancy by members of the Riss family the property was not advertised or publicly offered for sale and was shown only infrequently to prospective purchasers. In its returns petitioner reported the rentals received or accrued on the property and deducted depreciation on the buildings and furnishings. It also deducted the expenses incurred in the maintenance of the property, including repairs, upkeep, service bills, taxes, insurance and, for some of the years, the *233 salaries of two or more servants. After making certain adjustments of the depreciation, respondent allowed petitioner the deductions claimed only to the extent of the rentals received or acquired from Riss, Sr. The following table shows respondent's computations: Depre-
Dis-
Year
ciation
Expenses
Rents
allowed
1949
$1,458.31
$ 8,459.37
0
$ 9,917.68
1950
4,520.19
10,880.42
$7,400.00
8,000.61
1951
5,890.79
10,468.87
3,600.00
12,759.66
1952
6,276.69
16,256.14
3,600.00
18,932.83
1953
6,435.32
12,152.14
3,600.00
14,987.46
1954
6,560.52
10,925.75
3,600.00
13,886.27
1955
6,560.52
15,042.79
3,600.00
18,003.31
1956
6,560.52
13,668.72
3,600.00
16,629.24
The second property was a residence located at 3309 West 63rd Street, Shawnee Mission, Kansas, purchased by T.M. & E. in February 1952, for $38,021.50. This property was rented to Robert B. Riss for $90 per month. It was occupied by him and his family until about the middle of 1956. During the years 1952 to 1956, inclusive, petitioner paid certain expenses incurred in the maintenance of the property, including taxes, insurance, and cost of repairs. In its returns *234 for those years petitioner reported as income, the rents received and deducted the maintenance costs and depreciation. Respondent has disallowed the excess of the deductions claimed over the rentals received or accrued. The following table shows the total of the expenses, depreciation as adjusted by respondent, and the rents received or accrued. Depre-
Dis-
Year
ciation
Expenses
Rents
allowed
1952
$ 983.10
$1,361.34
$ 900.00
$1,444.44
1953
1,179.72
538.40
1,080.00
638.12
1954
1,179.72
2,533.72
1,080.00
2,633.44
1955
1,179.72
1,278.28
1,080.00
1,378.00
1956
1,179.72
1,235.57
450.00
1,965.29
The third property was a residence located at 2435 Drury Lane, Shawnee Mission, Kansas, which petitioner purchased, partly furnished, January 5, 1953, for $70,750. Petitioner allocated $15,000 to the land, $53,750 to the building, and $10,000 to the furniture and fixtures. The house contained about 25 rooms. This property was rented to Robert B. Riss, II, for $200 per month and was occupied by him and his family during 1953 and 1954 and until about May 1955. As with the two other residential properties referred to above, petitioner *235 paid or incurred expenses incidental to the maintenance of the property, which it deducted as ordinary and necessary business expenses, along with depreciation on the building and furnishings, and respondent has disallowed the excess thereof over the amount of rent received or accrued. The following table shows the total of such expenses and depreciation, as adjusted by respondent, the rents received or accrued and the amounts disallowed by respondent in each of the years involved: Depre-
Dis-
Year
ciation
Expenses
Rents
allowed
1953
$1,289.48
$ 9,498.14
$2,200.00
$ 8,587.62
1954
4,293.96
5,907.21
2,400.00
7,801.17
1955
4,061.43
5,349.09
800.00
8,610.52
1956
4,782.83
24,966.11
2,100.00
27,648.94
The above expenses include the cost of extensive repairs and improvements to the main residence, such as electrical wiring, plastering and carpentry work, and also the costs of refinishing some of the furniture, repairing or replacing equipment, landscaping, and the salary of one or more servants. Respondent determined that some of the expenditures were of a capital nature and should be added to the cost of the property. These included *236 legal fees and other costs incurred in a suit against the former owner of the property for breach of the sales contract with petitioner. It has been stipulated that some of the items, such as utilities and servant hire, were improperly deducted by petitioner and that such amounts should be included in the individual income of Robert. Respondent has determined that T.M. & E. is not entitled to deduct as ordinary and necessary business expenses any of the disallowed amounts and that Riss, Sr., individually is taxable on the amounts disallowed to T.M. & E. with respect to the State Line property. Opinion The questions presented here are whether the excess of the maintenance costs and depreciation on the three residential properties over the rents received from them is deductible by T.M. & E. as ordinary and necessary business expenses and whether the disallowed portions of the expenses and depreciation on the State Line property are taxable to Riss, Sr., as distributions from T.M. & E. Petitioner contends that it acquired and held the properties for investment purposes, while respondent contends that it acquired them primarily as residences for members of the Riss family. *237 The evidence, we think, fails to support petitioner's contention that it acquired the properties for investment or business purposes. The acquisition or ownership and renting of residential properties had no connection with petitioner's regular business of owning freight terminals and motor equipment for rental to Riss & Company. It was no part of petitioner's business to provide homes for its officers or stockholders. There is no evidence that petitioner ever purchased any other residential properties for investment or otherwise. The evidence, we think, fails to establish that profit was the primary motive for the purchase of any of the properties. That each of them was occupied soon after purchase by members of the Riss family strongly suggests that they were acquired for that purpose. Nor does the fact that the occupants paid rent add much strength to the business purpose argument. It is stipulated that the rents paid on two of the properties, the West 63rd Street and Drury Lane properties, were substantially below the fair rental values. Petitioner must have known at the time it purchased the properties that the costs of maintaining them and depreciation would far exceed the expected *238 rentals. It seems to us that the respondent has been generous in limiting the disallowed deductions to the excess of the amounts claimed over the rentals received. As to the question of the tax liability of Riss, Sr., for the disallowed amounts of the expenditures and the depreciation claimed on the State Line property respondent's position as stated in his brief is as follows: In summary, it is the position of respondent that, where a corporate officer or stockholders receives the free use of corporate property for his personal convenience, or receives the use of such property for a consideration amounting to less than its true value, both the fair rental value of the property, which may be indicated in part by depreciation attempted to be charged by the corporation, and any additional expenses paid by the corporation, if not included in determining the fair rental value, are includible in the ordinary income of the officer or stockholder. Accordingly, under the facts presented herein, the total amounts disallowed as deductions to T.M. & E. represented a taxable distribution to Riss, Sr. Cf., Challenge Manufacturing Company, supra. In the cited case, Challenge Manufacturing Company, supra, *239 the cost of owning and operating a yacht and depreciation thereon were held not deductible to the corporate owner as ordinary and necessary business expenses and were taxable distributions of earnings and profits to the principal stockholder for whose personal benefit the yacht was acquired and operated. In our opinion we said: Expenditures made by a corporation for the personal benefit of its stockholders or the making available of corporate-owned facilities to stockholders for their personal benefit may constitute taxable income in amounts equal to the fair value of the benefits involved. * * * The rule is applicable here, we think, and respondent's determination is sustained. Issue 23 (XXXII, XLVI) Business Expenses - Loss on Construction Equipment Findings of Fact In April 1953, T.M. & E. at the direction of Riss, Sr., purchased a substantial quantity of earth-moving equipment consisting of a drag line, 11 caterpillar tractors, 4 caterpillar scrapers, graders, tampers and other items, for a total price of about $200,000. Some of the equipment was new and some was used. After necessary repairs the equipment was all moved to the site of the Lake Project, referred to *240 in issue 4 above, and put to work building the dam under a contract between T.M. & E. and the Lake Project partnership formed by Riss, Sr., and Kay McAuliffe. Under this contract the partnership agreed to pay T.M. & E. 16 cents per cubic yard for hauling the dirt to the dam. Another unrelated company was engaged to do some of the dirt hauling at the same rate. Kay McAuliffe was put in charge of the construction equipment with the understanding that she was to operate it as a separate department of T.M. & E. It was contemplated that the equipment would be used on other construction jobs for the public, generally. Neither Kay nor any other employee of T.M. & E. had the experience or necessary qualifications for operating a construction business. Other than the work on the dam no construction contracts of consequence were obtained and the venture soon proved to be a financial failure. For the first year of its operation, 1953, T.M. & E.'s records show a net loss from construction of $78,847.32. The loss reflected depreciation charges on 26 pieces of equipment amounting to $51,281.28. T.M. & E.'s income account for that year shows $57,600 received from the Riss-McAuliffe partnership, *241 which was charged to Riss, Sr.'s account, and $3,180 from other customers. For 1954 the account shows total income of $467.50, all from other customers, and an operating loss of $27,335.39, after depreciation of $24,858.25. In May 1954 petitioner sold all of its construction equipment to Yerington Construction Company, hereinafter referred to as the construction company, for $102,000. This amount was within a few thousand dollars of the then book value of the equipment. The construction company gave T.M. & E. a note for that amount which was later converted into preferred stock. In 1955 the construction company was liquidated and its equipment was all acquired by petitioner. Before the sale of the equipment to the construction company, all of that company's stock was owned by Lee Dell Yerington. At about that time two-thirds of the company's outstanding stock was transferred to Kay McAuliffe and one-third was retained by Yerington. Kay gave Riss, Sr., a proxy to vote her stock. For her share of the construction company's stock Kay paid Yerington $54,000, which he lent to the construction company on its promissory note. This note also was later converted into preferred stock of *242 the company. The $54,000 which Kay paid for the construction company stock consisted of $25,600, paid to her by Riss, Sr., for her interest in some of the real estate in the Lake Project and $28,400 borrowed from Oklahoma-Colorado. Riss, Sr., agreed to hold her harmless from any loss on her investment in the construction company stock. For 1955 T.M. & E.'s records show a loss of $25,486.79 from the operation of the construction business, after a depreciation deduction of $19,664.19. The income shown is $27,973.28, of which $13,929.04 was from the Riss-McAuliffe partnership. In its returns for the years 1953, 1954 and 1955 petitioner claimed the deduction of the above-shown losses on the construction business, which respondent has disallowed. Opinion Petitioner's only contention with respect to the construction equipment is that respondent erred in treating it as the property of Riss, Sr., individually, and in disallowing to petitioner the deduction of the excess of the depreciation and expenses of operating the equipment over the income received from it. Respondent's position is that this equipment was not property used in petitioner's trade or business and that the equipment *243 was purchased and utilized primarily for the purpose of building the dam on the Lake Project for the benefit of Riss, Sr. Respondent has included the amounts disallowed to T.M. & E. in the individual income tax returns of Riss, Sr. and that question also is in issue in these proceedings. It is true that the construction equipment was not used in petitioner's principal business of owning and renting transportation equipment, and petitioner does not so contend. However, we think the evidence does show that petitioner purchased equipment with the intention of going into the construction business and actually did so. That it did so at the direction of Riss, Sr., and to gratify his long-standing desire to go into the construction business [9] is not irreconcilable with a business purpose on petitioner's part. All that T.M. & E. or Riss & Company ever did was what Riss, Sr., wanted done. Petitioner held itself out to the public as being in the construction business and performed some outside work. The evidence is that petitioner received payment for all *244 of the work done on the dam at approximately the going rate for such work. It claimed the deduction of only the difference between the amounts received from all sources and the depreciation and expenses of operating the equipment. The depreciation accounted for the greater portion of the deductions claimed. Respondent has made certain adjustments in the depreciation, which are not in issue here. Respondent makes the contention, which finds some support in the evidence, that Riss, Sr., and the Riss-McAuliffe partnership receive benefits from the services of the construction equipment for which they did not pay full value. However, respondent has not made any determination of the actual value of such benefits but has included in Riss, Sr.'s income all of the amounts disallowed as deductions to T.M. & E. Whether these amounts are includable in Riss, Sr.'s income is one of the issues raised in Docket No. 74954. Nothing would be gained here by further detailed analysis of petitioner's construction operations in the light of judicial definitions of what constitutes a trade or business. [10] The evidence is convincing that petitioner's venture in the construction business, although a notable *245 financial failure, meets the business purpose test. We therefore hold that respondent erred in disallowing as business expenses the excess of the costs of operating the construction equipment over the income derived therefrom. It follows that the amounts disallowed as deductions to T.M. & E. are not includable in the income of Riss, Sr. Issue 24 (XXXIII) Business Expenses - Construction Work at Terminals at Jersey City and Cleveland. Findings of Fact T.M. & E. built terminal facilities at Jersey City, New Jersey, commenced during 1949, at a contract cost of $330,986.66. This terminal was built on filled land, that is, swamp land on which dirt had been dumped to create industrial construction sites. T.M. & E. entered into a contract with Brown & Matthews, Inc., of New York City, as contractors to construct and complete this terminal according to usual and established construction practices and according *246 to certain specifications. Immediately after the building was constructed, numerous structural defects appeared, which included sinking of the floors from improper foundation work, as well as cracking of walls, defective plumbing, and many other items. Some of the floor areas where pilings were not properly used had sunk as much as one foot. On discovering these defects petitioner immediately made claim against Brown & Matthews. A claim for defective construction was also made against Brown & Matthews in connection with the terminal facility which it built at Cleveland, Ohio, in 1950, which also developed varied and substantial structural defects requiring substantial expenditures by T.M. & E. for repairs. [11]
The controversies between petitioner and Brown & Matthews culminated in litigation in the Superior Court of New Jersey, instigated by Brown & Matthews, to recover a balance claimed to be due from petitioner on the construction contracts. Under arbitration proceedings, Brown & Matthews, in July 1953, made a payment to petitioner of $75,000 *247 in consideration for petitioner's releasing all claims for defective or negligent performance of the contracts at both the Jersey City and Cleveland terminals. Petitioner treated this amount as a reduction of cost of the Jersey City terminal. One of the major repair items was repaving the macadam parking yard at the Jersey City terminal. The work carried a guaranty of 1 year. The repaving was done in 1952 by another contractor at a cost of $11,500. Other repairs at the Jersey City terminal in 1952 amounted to $4,944.59. This amount included the cost of some items which had been erroneously omitted by Brown & Matthews and others which had to be replaced. Also during 1952 petitioner paid $24,525 to a contracting firm in Euclid, Ohio, for repairs to the yard and parking area at Cleveland. In 1953 petitioner paid out $67,697.63 additional for repairs and replacements at the Jersey City terminal. Even with the expenditure of the above amounts the Jersey City and Cleveland terminals were not brought into first class condition and other latent defects had to be corrected. Also during 1953 petitioner paid out legal fees of $5,000 and other incidental costs of $8,625.53 in connection *248 with the litigation with Brown & Matthews. In its returns for 1951, 1952 and 1953 petitioner deducted all of the above-stated costs of repairs as current operating expenses. Respondent disallowed the claimed deductions and treated the payments as capital expenditures to be depreciated over the life of the terminal buildings and facilities. [12]
Opinion The facts found above include substantially all of those requested by petitioner, most of which are acquiesced in by respondent. The evidence of record contains considerably more information about the construction faults at the Jersey City and Cleveland terminals and the work that had to be done to correct them. These details, however, are of but little value in determining the question before us. They afford no basis for a reasonable separation of the items that were obviously of a capital nature, such as rebuilding some portions of the terminal buildings and paving the parking areas, and the lesser items which were more in the nature of current repairs or short-lived improvements. In any *249 event, we can not determine on the evidence before us the exact nature or useful life of the repairs, or replacements, or additions, for which the expenditures were made. Petitioner treated the $75,000 arbitration award which it received from Brown & Matthews as a capital item, reducing the costs of its Jersey City terminal. Apparently, the award compensated, at least in part, for the same defects and omissions for which the expenditures in question were made. That petitioner was forced to make the repairs to keep the terminals in efficient operating condition does not affect the question whether they were capital expenditures or business expenses. See Woolrich Woolen Mills v. United States, 289 F. 2d 444 (C.A. 3); Hotel Sulgrave, Inc., 21 T.C. 619. On the evidence of record respondent's disallowance of the deductions claimed is sustained. Issue 25 (XXXIV) Salary of Richard R. Riss, II. Findings of Fact In its returns for the years 1951 to 1955, inclusive, T.M. & E. claimed deductions for salary paid to Richard R. Riss, II, which respondent allowed in part and disallowed in part as follows: Year
Paid
Allowed
Disallowed
1951
$24,688.26
$12,000.00
$12,688.26
1952
31,807.81
12,000.00
19,807.81
1953
46,286.36
12,000.00
34,286.36
1954
25,947.41
12,000.00
13,947.41
1955
14,270.91
5,351.61
8,919.30
*250 As stated above, T.M. & E.'s principal business was the ownership and rental of freight transportation equipment. It had only three or four employees and occupied offices with Riss & Company. In 1951 Richard succeeded his father, Riss, Sr., as president of T.M. & E. and served in that capacity during the years 1951 through 1954 and until April 29, 1955, when he resigned and Riss, Sr., again became president of the company. Richard became vice president of petitioner in 1950 when he was 25 years of age. He had had no previous experience as an executive. He reported earnings of $3,900 in 1949 and $6,030.95 in 1950. All of his 1949 earnings and a portion of those in 1950 were from T.M. & E. and Riss & Company. Richard's services as president of T.M. & E. consisted in part of supervising the construction and leasing of its terminals, and looking after petitioner's equipment. He worked long hours and kept well informed about petitioner's business. He participated in the discussion of policy matters of the company but the final decisions always rested with Riss, Sr.
As president of petitioner Richard received the same compensation as his brother Robert received from Riss & Company *251 as its vice president. The compensation of both was determined on the basis of a percentage of Riss & Company's gross revenue. Opinion Our question here is whether the salary paid to Richard by petitioner was reasonable compensation for the services which he actualy rendered to the company. We take at face value the testimony of petitioner's witnesses that Richard was a capable executive and that he usually worked long hours. Nevertheless, we think that the compensation paid him amounting to over $31,800 in 1952 and $46,000 in 1953 was excessive considering his age, lack of experience or special qualifications for the job, and the limitation on his responsibilities for the conduct of the business. It was his father, Riss, Sr., who made all the important decisions and actually controlled the business. Moreover, Richard's salary was determined not by the services which he rendered petitioner but by the gross revenue of an entirely separate, though related corporation, Riss & Company. As a method of determining compensation that did not meet the test of reasonableness. Incentive pay is usualy geared to the gross revenue or profits of the business served. If it is to be inferred *252 that Richard's services on behalf of T.M. & E. contributed in some manner to the business of Riss & Company[13] then he should have been compensated to that extent by Riss & Company and not by petitioner. It is to be noted that Richard's compensation varied in amount from $46,286.36 in 1953 to $25,947.41 in 1954, without the showing of any change in the service which he performed for petitioner or in petitioner's benefits from his services. On the evidence as a whole we cannot escape the conviction that the compensation paid to Richard by petitioner was to a large extent the award of paternal benevolence rather than compensation for services actually performed. In our opinion, based on such evidence as has been made available to us, we think that reasonable compensation for Richard's services as petitioner's president would have been not more than $15,000 per annum. Issue 26 (XXXV) Bad Debts - Miscellaneous. Findings of Fact During *253 the years 1950, 1951 and 1955 petitioner charged off as worthless, and deducted in its returns, a number of bad debts including the following: 1950
Baltimore-St. Louis Express Co.
$7,500
1951
George Taylor
1,900
1955
Richard Minitree
4,000
1955
M. G. Hammergren
1,000
1955
William H. Doer
2,500 Respondent disallowed the deduction of all of the amounts on the grounds that they did not constitute allowable bad debt deductions for the years when claimed. As to the Baltimore-St. Louis Express Co. debt of $7,500 petitioner's return for 1950 contained the following notation: Open Account Loan to Provider
Line Baltimore St. Louis Express,
Company operation unprofitable
and business abandoned, causing
loan to become worthless in 1950
7,500.00
George Taylor was at one time a detective residing in Colorado Springs. He solicited freight for Riss & Company in that area. After he suffered a leg amputation Riss, Sr., lent him $2,000. A year or so later he died in California, having theretofore repaid $100 of Riss, Sr.'s loan. Richard Minitree was a potato broker in Colorado whom Riss, Sr., had known for a number of years. Riss, Sr., lent *254 him $4,000 to promote the sale and transportation of potatoes. He went broke. M. G. Hammergren was sales manager for a Buffalo, New York, concern for which Riss & Company did hauling. He was responsible for a considerable amount of petitioner's business with the firm. Riss, Sr., lent him $1,000 to help start a business of his own in Dallas, Texas. Later he brought some business to Riss & Company and told Riss, Sr., that he would soon be able to repay the loan. That was before 1955. Riss, Sr., never saw or heard of him again. William H. Doer represented himself to Riss, Sr., as having a contract with the Government to furnish grave markers for servicemen's graves in Government cemeteries, both in the United States and abroad. On the expectation of getting the hauling job for the markers, Riss, Sr., lent or advanced him $2,500 to help promote the business. Doer never repaid the loan. He told Riss, Sr., sometime prior to 1955 that the deal with the Government had fallen through but that he had a diamond ring which he would pledge on the loan. Riss, Sr., never again saw Doer or the diamond ring. Opinion The above statement of facts reflects substantially all the evidence of record *255 of any materiality in determining the deductibility of the disputed bad debts. It leaves unanswered several essential questions. We do not know when the loans were made, when they became due and payable, whether or not they were evidenced by promissory notes, by whom they were made, whether by Riss, Sr., individualy, or petitioner, whether they were in fact bona fide loans which were expected to be repaid, and whether they became worthless and uncollectible in the years when claimed as deductions. According to the testimony of Riss, Sr., some of the loans, if such they were, appear to have been made on behalf of Riss & Company or Riss, Sr., rather than petitioner. For lack of proof that the amounts claimed were debts owing to petitioner and properly ascertained to be worthless and charged off during the taxable years, respondent's action in disallowing the deductions is sustained. Issue 27 (XXXVI) Bad Debt - Yerington Construction Company Findings of Fact In its return for 1956 petitioner claimed the deduction of $115,082.61 as a bad debt owed to it by Yerington Construction Company. Respondent disallowed the deduction. The amount in question represented the sale price of *256 the equipment which petitioner transferred to the Construction Company in 1954 and for which it received a promissory note, in the amount of $102,000, later converted to preferred stock, a $10,000 note of the company representing monies loaned or advanced to it by petitioner some time after 1954 and $3,082.61 owing to petitioner on open account. Yerington Construction Company suffered continuous losses from the beginning of its association with petitioner. A report of the financial condition of the company submitted at a stockholders' meeting held April 27, 1955 (attended only by Riss, Sr., and Kay McAuliffe) showed, for the period May 1, 1954 to March 31, 1955, construction receipts of $377,005.10, expenses of $540,104.30 and a loss of $163,099.20. The company's balance sheet showed a paid-in surplus of $8,284.39 and earned surpluses of $3,015.91 for 1953. For 1954 and 1955 it showed surplus deficits of $91,847.62 and $73,932.63, respectively. At a stockholders' meeting held June 14, 1955, (with Riss, Sr., and Kay McAuliffe attending) a resolution was adopted authorizing Kay to dispose of the assets of the company to satisfy its creditors and to file appropriate articles of dissolution *257 with the secretary of state for the State of Missouri. The articles of dissolution were filed July 6, 1955. In final liquidation of the company its construction equipment was acquired by T.M. & E. September 30, 1955, at a price, as shown in T.M. & E.'s return for 1955, of $168,011.70. Opinion Respondent's position is that the alleged $102,000 indebtedness of the construction company was not a debt but was a capital investment in the preferred stock of the company and that the loss sustained by petitioner on the stock was a capital loss. Respondent further contends that in any event the evidence fails to show that the debt, or investment, had any value at January 1, 1956, or that it became worthless during that taxable year. We think that both contentions of respondent are well founded. There is but little room for doubt that the $102,000 item was a contribution to the capital of the construction company, although it was at one time given the form of a loan. If it ever constituted a loan it lost that identity and became a capital investment when petitioner voluntarily exchanged the company's note for that amount for preferred stock of the company. That this was done under the necessity *258 of establishing credit so that the company could continue operations does not affect the consequences. See Universal Castings Corporation, 37 T.C. 107, affd. 303 F. 2d 620 (C.A. 7); Crown Iron Works Co. v. Commissioner, 245 F. 2d 357 (C.A. 8). In the last named case the Court said: no doubt, the issuance of preferred stock, or even common stock, can be shown to have been intended as security for debt and be given that status. We doubt, however, that there can be any form of corporate security which is to be regarded for income tax purposes as corporate indebtedness, and for credit purposes as part of the capital structure of the corporation. * * * We also agree with respondent that there is no showing that the alleged debts of the construction company became worthless during the taxable year 1956. There is every indication that they were worthless at the close of 1955, or even earlier. The company had become completely insolvent and its liquidation and the sale of its assets to satisfy its creditors was agreed upon in June 1955. Respondent's disallowance of the deduction as a bad debt is sustained. Issue 28 (XXXVII) Business Expenses *259 - Expenses of Proposed Incorporation of Colonial Casualty Company of America Findings of Fact In its return for 1955 petitioner claimed and respondent disallowed a deduction of $806.40 as attorney's fees and other expenses relating to the organization of a proposed casualty insurance company, Colonial Casualty Company of America. At some time thereafter and before the incorporation was completed, the undertaking was abandoned and the company never operated. Opinion Petitioner's complete argument on this issue, as presented in its brief, is as follows: The obvious business purpose of commencing a public liability insurance company to insure the equipment of T.M. & E. is unquestioned. The decision to abandon these plans, after the original articles had been drafted and attorney's fees paid, terminated this project. These expenses were incurred in connection with business purposes and certainly should be allowed as claimed without question. In the first place, it is not in evidence that the purpose for which the proposed corporation was to be organized was to insure petitioner's equipment. In his brief testimony on the matter, Riss, Sr., was vague as to what was to be the *260 business of the corporation or who was to own its stock. He testified that it had not been determined whether the stock would be held by petitioner or by Riss & Company. Providing casualty or liability insurance on the equipment operated by Riss & Company would seem to have been the business of that company rather than petitioner. We do not know when or for what reason the plan to organize the corporation was abandoned. In any event there is no factual support for treating the expenditures in question as a business expense of petitioner. There is no evidence that the organization of such a corporation as that proposed was either ordinary or necessary in the operation of petitioner's business. Respondent's disallowance of the deduction is therefore sustained. Issue 29 (XXXVIII) Business Expenses - Legal Fees Paid in Defense of Quo Warranto Proceedings Findings of Fact In its return for 1956 petitioner claimed the deduction of legal and professional expenses in the amount of $16,041.92 incident to proceedings instituted by the Attorney General of the State of Missouri January 25, 1956, to oust petitioner and Riss & Company from doing business as Delaware corporations within *261 the State of Missouri. The proceedings resulted in a judgment entered by the Supreme Court of Missouri April 11, 1960, entitled "State of Missouri ex rel. v. Riss & Company, Inc. and Transport Manufacturing & Equipment Company of Delaware," 335 S.W. 2d 118, which imposed fines on petitioner and Riss & Company of $50,000 each, plus court costs. On April 9, 1956, and again on April 17, 1959, while the proceedings were pending the parties were required by court orders to deposit $5,000 each as advance court costs. In the judgment entered by the Court April 11, 1960, it was found: (1) that the charges set forth in the information relating to non-payment of property taxes, violation of Public Service Commission regulations, and violation of the statutes of Missouri relating to the size and weight of commercial motor vehicles within this state were not sustained by the evidence. (2) that respondents were in violation of the laws of Missouri in the operation of their motor vehicles over the highways of Missouri without proper Missouri registration licenses; that said violations were constant and repeated over a period of almost two years and constituted an abuse of the *262 franchises granted respondents and a violation of the trust imposed in them by the State. The following facts were found by the Court: (1) That respondents did not have good reason to believe and did not believe that they were acting in compliance with the registration laws of Missouri in the operation of their motor vehicles licensed in other states upon the highways of Missouri from 1950 until the filing of this action in January, 1956; (2) That, following their conferences with General Dalton in 1954, respondents did not have good cause to believe and did not believe that the law enforcement officials of this State would accept and agree to registration of their motor vehicles in any manner other than as required by secs. 301.020 and 301.270, as hereinabove construed; (3) That respondents did not have good reason to believe and did not believe that upon presentation and hearing of properly joined issues of law and fact (as was done in the instant case), the courts of this State would ultimately construe Missouri's registration statutes in any of the alternative respects contended for by them; and (4) That the actions brought by respondents for the alleged purpose of procuring *263 an adjudication of the controversy existing between them and the law enforcement officers of Missouri were not motivated in good faith but instead were instituted for the express purpose of delaying such an adjudication, during which they would be enabled (as they thought) to continue unlawful operation of such vehicles with impunity. Respondent disallowed $9,382.99 of the $16,041.92 claimed as a deduction by petitioner in its return. The parties have stipulated that $1,200 of that amount is not deductible, leaving in dispute $8,182.99 made up of the following items: Date
Payee
Amount
4/10/56
Clerk of Supreme Court of
Missouri
$4,250.00
4/10/56
Gage, Hillix, Moore, Park
and Jackson
2,511.46
7/26/56
Gage, Hillix, Moore, Park
and Jackson
986.33
9/24/56
Beryl F. Finley, Court Re-
porter
435.20
Total
$8,182.99 Petitioner's return shows that the above items represent 85 percent of the total of such payments and that the remaining 15 percent was allocated to Riss & Company. Opinion The disputed deductions consist of a portion of the advance court costs of $5,000 which petitioner deposited with the clerk of the court pursuant to court *264 order in 1956 and attorney's fees paid in that year in defense of the action brought against it in the Missouri state court. Respondent opposes the deduction for reason first, that its allowance would be in violation of public policy; that the deposit of advanced court costs in 1956 was not an actual payment in that year but was contingent upon subsequent events and that there is no proven basis for any allocation of such expenditures between petitioner and Riss & Company. All of respondent's objections seem to us to be well founded. Petitioner was convicted of violating the laws of the State of Missouri regarding the registration of his vehicles and was required to pay in a subsequent year a fine of $50,000. The deduction of the fine would clearly be prohibited as in violation of public policy. See Commissioner v. Heininger, 320 U.S. 467, and Tank Truck Rentals v. Commissioner, 356 U.S. 30. In the Heininger case the Court said (at p. 473): "Where a taxpayer has violated a federal or a state statute and incurred a fine or penalty he has not been permitted a tax deduction for its payment." The Tank Truck Rentals case involves fines imposed upon the trucking *265 company for violation of the weight regulatory laws of the State of Pennsylvania. Petitioner's violation of the State of Missouri's registration laws was determined by the Supreme Court of the state to be intentional, and petitioners do not here contend otherwise. In any event, no differentiation exists in the application of the public policy rule between innocent and willful violations. Tank Truck Rentals v. Commissioner, supra. Even assuming that the $5,000 deposit which petitioner was required to make in 1956 as advance court costs was a payment made in that year, that payment and the attorney's fees and other costs of the trial would have no better standing as expense deductions than the fine itself. To permit the deduction of the expenses incident to the action against petitioner would have the same result of "reducing the 'sting' of the penalty prescribed by the state legislature." Tank Truck Rentals v. Commissioner, supra.The courts have consistently disallowed amounts paid out in the unsucessful defense of prosecution for a criminal offense. Burroughs Building Material Co., 18 B.T.A. 101, affd., 47 F. 2d 178 (C.A. *266 2); C. W. Thomas, 16 T.C. 1417; Thomas A. Joseph, 26 T.C. 562; cf. John W. Clark, 30 T.C. 1330; and Morgan S. Kaufman, 12 T.C. 1114, cited by petitioner where the legal lees were incurred in defense of criminal charges which were later dismissed. Issue 30 (XXXIX) Business Expenses - Payments of $500 in 1949 as "Commissions" and $2,000 in 1953, "unidentified" Findings of Fact In its return for 1949 petitioner claimed the deduction of $500 as commissions paid to W. E. Reefer. The payment was for services in connection with petitioner's purchase of used trailers. It also claimed the deduction of $2,000 as "repairs." Opinion The only evidence as to the $500 payment to Reefer in 1949 is that it was for services connected with petitioner's purchase of used trailers. Reefer was identified by Riss, Sr., as a "provider - out of Detroit." As to the $2,000 item there is no evidence whatsoever and no findings of facts were requested by petitioner. On this state of the evidence we have no choice but to sustain respondent's disallowance of the claimed deductions for lack of evidence of error in his determination. Issue 31 (XL) *267 Loss on Demolition of Building Findings of Fact In its return for 1955 petitioner claimed the deduction of $31,100 as a loss sustained on the demolition of a building purchased in that year. Respondent disallowed the deduction on the grounds that the cost of demolition and a portion of the cost of the entire property which petitioner allocated to the building were all a part of the cost of the land itself. The property in question was located at Halsted and Lumber Street, Chicago, Illinois. It was purchased by Riss, Sr., acting for petitioner, from Swift and Company in March 1955 for $52,500. It consisted of a lot approximately 212 X 245 feet, on which there was an old two-story brick building. The ground floor of the building had been used by Swift and Company to house sheep and the upper floor to store feeds. The wooden portions of the building were partially rotted and the building as a whole was in bad condition. Riss, Sr., acquired the property for use by T.M. & E. as an additional terminal facility. It was adjacent to a terminal already owned by T.M. & E. and used by Riss & Company. Riss, Sr., thought that the brick walls of the building might be retained in converting *268 the property to an auxiliary terminal building. He was advised, however, by an architect who examined the property that no part of the building could be used and that it should be demolished. In March 1955 a wrecking firm was engaged to remove the building and prepare the lot for use as a parking area. The total cost of the work to petitioner was $6,100. The property has since been used by Riss & Company as a parking lot for its trucks. In its return for 1955 T.M. & E. claimed a loss deduction of $31,100 as the cost of the demolition of the building; this included $25,000 representing an allocable portion of the purchase price of the entire property. Opinion The evidence fails to show that petitioner acquired the property in question with the intention of using the building as a truck terminal, or for any other purpose, or that the building had any value whatsoever at the time of acquisition. The architect who inspected the property for petitioner and who appeared as a witness described the building as "a very, very old sheep barn * * * in a terrible shape." He could not recall whether his inspection was made before or after March 1 when petitioner contracted to make the purchase. *269 The testimony of Riss, Sr., that he, acting for petitioner, had the intention of using the brick walls, if nothing more, in converting the building to a truck terminal has no corroborative evidence. Riss, Sr., testified that he could not remember whether the inspection was made before or after March 1, 1955, the date of the purchase. Regardless of the current value of the land itself, of which there is no satisfactory proof, we can not find on the evidence of record what portion, if any, of the total purchase price of $52,500 was paid for the building. In N. W. Ayer & Son, Inc., 17 T.C. 631, 635, we said: Cases involving the interpretation of this Code provision [section 23(f), 1939 Code - section 165(a), 1954 Code] and the regulation promulgated thereunder look to the intent of the purchaser at the time of the purchase. If the property is bought with the intent to raze the buildings situated thereon and erect a new building, no deduction is allowed at the time of demolition. * * * The rationale of such cases is that where there is a purchase of land with the intent to demolish any building situated thereon and erect a new one, no part of the price paid is allocable *270 to the buildings since the buildings have no value to the purchaser and it is the land which is purchased, not the land and buildings. The purchase price, therefore, represents the cost of the land. There is no proof here of any intention on petitioner's part to erect a new building on the premises. A reasonable assumption is that the property was acquired for use as a parking lot, the use to which it has been put by petitioner since its acquisition. At any rate the evidence fails to establish that the property was acquired for any different purpose or that all of the purchase price was not paid for the land itself. Respondent's disallowance of the loss claimed by petitioner on the demolition of the building is, therefore, sustained. Issue 32 (XLI, XLVI) Business Expense - Cost of Tires for Construction Equipment. Findings of Fact In 1955 petitioner paid McDowell Tire Company $705.27 for tires purchased and used on its construction equipment in 1953. The delay in payment for the tires was due to the fact that the original bill was misplaced. A new bill was submitted to petitioner and paid in 1955. Respondent disallowed the claimed deduction solely on the grounds that *271 the expenditure related to the Lake Development which was owned by Riss, Sr., and that it was not an expense of petitioner. Respondent has included the amount in the taxable income of Riss, Sr., for that year. Opinion The only question in issue here is controlled by our ruling above that the construction equipment was owned by T.M. & E. and operated by it as a business venture. We therefore hold that the amount in question is deductible by petitioner as a business expense. It follows, of course, that the amount of $705.27 was not income to Riss, Sr., as determined by respondent. Issue 33 (XLII) Loss on Stock of Southwestern Transit Company. Findings of Fact In its return for 1950 petitioner claimed a deduction of $5,000 representing the cost of stock of Southwestern Transit Company which allegedly became worthless in that year. Southwestern Transit Company was said to be a wholly owned subsidiary of petitioner. It was at one time one of Riss & Company's "provider" companies. T.M. & E. acquired its stock in August 1947 in satisfaction of that company's indebtedness to it. Petitioner's return for 1948 shows a sale of the stock for $5,000 with no resulting gain or loss. *272 Its return for 1949 shows the stock as an investment acquired December 31, 1948, for $5,000. The report of one of the examining revenue agents, on which the notice of deficiency is based, states that: Loss claimed from Southwestern Transit Co. Stock is not allowed. This stock was purchased from Riss & Co. on 12/31/48 and there is no proof that the stock was not worthless when acquired. Opinion The above facts reflect substantially all that the evidence of record discloses about the Southwestern Transit Company stock and its acquisition, ownership or disposition by petitioner. In its brief petitioner makes the argument that: The agents did not question the worthlessness of the stock in 1950 and only raised the question of its value when acquired, which has not been sustained by any evidence introduced by respondent. The respondent's determination is one on which respondent should bear the burden of proof as opposed to the taxpayer being forced to bring in financial statements of this corporation dating back to 1948. The loss should be allowed as claimed. The burden of proof with respect to all the facts necessary to support petitioner's claim for the deduction rests on petitioner *273 and not on respondent. In the absence of such proof respondent's determination is certained. Issue 34 (XLIII) Gain on the Sale of Land in Cleveland, Ohio Findings of Fact In July 1953, petitioner transferred four parcels of real estate located in Ohio, Pennsylvania, Oklahoma and New Jersey to three of the stockholders, Richard, Robert and Louise Riss, for a stated consideration of $70,00. The properties were vacant land previously forming a part of larger tracts which petitioner had acquired for terminal sites at those locations. The terminals had been built and were then in operation and the vacant parcels were outside of the terminal enclosures. Petitioner had been advised by its bankers that it should dispose of these surplus properties. Respondent has determined that the several properties in question had a combined fair market value greatly in excess of the price at which they were sold to the Riss children and that in such transaction each of the children received taxable income equal to one-third of the excess of such fair market values over the prices paid for the properties. The parties have stipulated in these proceedings that the purchasers are so taxable and *274 have also stipulated the fair market value of each of the properties and the amounts taxable to the purchasers as follows: Fair
Consideration
Market
Location of Property
Paid
Value
Difference
Cleveland, Ohio
$42,500.00
$203,768.50
$161,268.50
Oklahoma City, Oklahoma
5,000.00
17,500.00
12,500.00
Jersey City, New Jersey
12,500.00
35,000.00
22,500.00
Philadelphia, Pennsylvania
10,000.00
20,000.00
10,000.00
TOTALS
$70,000.00
$276,268.50
$206,268.50
A warranty deed transferring title to the Cleveland property to the Riss children was forwarded by petitioner to a law firm in Cleveland, Ohio, for recordation June 29, 1953, and was recorded July 6, 1953. The sale of the property to the Riss children was reported in petitioner's return for 1953 as having taken place June 23, 1953. Petitioner had been offering the Cleveland property for sale since about 1951. On June 9, 1953, it gave an option to Ostendorf-Morris, hereinafter identified as O-M, a Cleveland real estate firm, to purchase approximately 16 acres of the property on or before June 20, 1953, for $5,000 per acre. Petitioner was informed that the optionee had an undisclosed prospective *275 purchaser for the property. Thereafter O-M requested an extension of the option to June 27, 1953, which Riss, Sr., refused by telegram dated June 11, 1953. One June 19, 1953, O-M wrote the following letter to Riss, Sr.: Dear Mr. Riss: In your telephone conversation with our Mr. Donald Cloak this morning, you mentioned that you had recently caused the optioned property to be transferred to your son and that it is your desire to defer the actual transfer of title to a date not less than six months subsequent to such conveyance to your son. Because the Option was granted to us without any provision for such deferred conveyance we are obliged to exercise it in accordance with the terms of the Option. We have been unable today to reach the ultimate purchasers involved in this purchase to ascertain whether or not their plans would be accommodated under such deferred conveyance of title and we will not be able to reach them until Monday of next week. We wish, however, to assure you that we will do whatever seems possible to have them try to accommodate their situation to your desires in this respect. Very truly yours, OSTENDORF-MORRIS COMPANY By letter of the same date O-M notified *276 petitioner of its exercise of the option to purchase the property. At the request of Riss, Sr., the option agreement of June 9, 1953, between petitioner and O-M was canceled and a similar option agreement between O-M and the three Riss children was entered into. The new option agreement was embodied in a letter from O-M to petitioner dated August 7, 1953, which letter became the agreement when it was signed by petitioner and the three children. On January 12, 1954, O-M notified the three children that the option to purchase the Cleveland property had been assigned to Clevite Corporation, the "undisclosed" prospective purchaser referred to above, and on the same date Clevite gave notice that it was exercising the option. The total purchase price of the land conveyed to Clevite Corporation under the option agreement, 18.7935 acres, was $93,967.50. For the year 1954 Robert, Richard and Louise Riss filed a partnership return in which they reported a capital gain on the sale of the Cleveland property of $65,449.40. Respondent has determined that a capital gain on the sale in the amount of $65,612.50 was realized by petitioner, T.M. & E. Opinion The sole question presented under *277 this issue is whether the sale of the Cleveland property was in actuality a sale by petitioner, resulting in its realization of capital gain as determined by respondent. The chain of events leading up to the sale leave but little doubt that the transfer of this property to the Riss children, all stockholders of the petitioner, was made at the direction of Riss, Sr., and for the purpose of shifting the tax burden on the gain on the sale from petitioner to the individual stockholders. While the evidence leaves some doubt as to the actual date of the transfer of the property to the Riss children it is plain enough that it was done after petitioner had learned that the option to purchase would be exercised and at a time when negotiations for the sale of the property were substantially concluded. In such circumstances we think that the rationale of the United States Supreme Court decision in Commissioner v. Court Holding Co., 324 U.S. 331, is controlling. The Court there said: A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. n4 To permit the true nature of a transaction to *278 be disguised by mere formalism, which exist solely to alter tax liabilities, would seriously impair the effective administration of tax policies of Congress. [Footnote omitted.] In the Court Holding Co. case the taxpayer corporation transferred an apartment building, its only asset, to its stockholders as a liquidating dividend, after negotiations for the sale of the property had already been substantially completed, and the stockholders then sold it to the same purchaser on the same terms. See also Fairfield Steamship Corporation, 5 T.C. 566, affd. 157 F. 2d 321 (C.A. 2); Rose Kaufmann, 11 T.C. 483, affd. 175 F. 2d 28 (C.A. 3). At the time of the transfer of the property in question to the stockholders petitioner was under a binding escrow agreement to sell it to O-M at a fixed price. The stockholders necessarily acquired the property subject to that agreement, or the like modified agreement substituted therefor. There was nothing left for the stockholders to do but pass title to the property on to the purchasers under the terms of the escrow agreement. They did not and could not have exercised any will of their own over *279 the ultimate sale of the property. It is unnecessary to point out that one of the stockholders, Richard Riss, being president, vice president and a director of petitioner, was under a trust obligation to act for the best interests of the corporation and its stockholders and that his participation in the purchase of the property from petitioner at less than value for personal gain would have been at least violative of that trust. The only case cited by petitioner is Cramp Shipbuilding Co., 17 T.C. 516. The case has no application whatever to the facts in the instant case. It dealt with the question of the year in which income subject to a dispute as to ownership should be reported, with reference to such cases as North American Oil v. Burnet, 286 U.S. 417, and Security Mills Co. v. Commissioner, 321 U.S. 281. On the facts before us we find no error in respondent's determination that petitioner realized taxable gain on the sale of the property to O-M's assignee, Clevite Corporation. The following issues numbered 35 to 38, inclusive, relate to Riss, Sr., only: Issue 35 (XLIV-XLVI) Expenses of Riss, Sr., Paid by Riss & Company and T.M. *280 & E. - Whether Taxable to Riss, Sr., as Distributions of Earnings. Findings of Fact Respondent has included in petitioner's income for 1952 and 1953 as constructive dividends the disallowed portions of certain expenses which were paid to him, or on his behalf, by Riss & Company and T.M. & E. Some of those items have been considered above in relation to their deductibility by Riss & Company and T.M. & E. The only additional items involved here are the costs of maintaining automobiles which Riss & Company and T.M. & E. provided for the personal use of the petitioner, his wife and his daughter, Louise. At all times here material Riss & Company furnished the petitioner a Cadillac automobile for his personal use. Petitioner used the automobile for both business and personal transportation, such as commuting from his home to his office and for trips to his various clubs. When petitioner was out of town the automobile was available for the use of others at the office of Riss & Company. Respondent determined that the use of the automobile resulted in distributions to petitioner of not less than $1,000 per year. The parties have stipulated that during the years 1949 to 1956, inclusive, *281 T.M. & E. owned and maintained certain "service cars" one of which was made available to each of its stockholders, and to Louise V. Riss, petitioner's wife and Lona Riss, his sister, and that T.M. & E. is not entitled to deduct the operating costs and depreciation attributable to those cars. The following amounts representing the value which respondent has ascribed to the use of the automobiles by Louise V. Riss and Lena Riss and a portion of the insurance and operating expenses borne by T.M. & E. have been included in petitioner's income: Value of
Insur-
Operating
Year
Use
ance
Expense
Total
1952
$1,350.00
$150.96
$517.70
$2,017.66
1953
1,650.00
257.74
813.37
2,721.11
1954
1,650.00
316.84
599.26
2,566.10
1955
2,250.00
339.33
765.39
3,354.72
1956
2,400.00
200.60
928.07
3,528.67
Opinion Our determination under Issue 3 above relating to respondent's disallowance in part and allowance in part of the deductions claimed by Riss & Company on account of reimbursements made to Riss, Sr., is controlling here as to the particular items dealt with therein. Inasmuch as the evidence fails to show that the disallowed portions of the *282 claimed deductions were paid to petitioner as reimbursements for expenditures made on behalf of Riss & Company, it also fails to show that the amounts were not received by petitioner for his personal use. Our determination that some of the disputed amounts are not deductible as business expenses of Riss & Company or T.M. & E., requires a corollary determination that they are taxable as distributions to petitioner. The only additional items involved here are the disallowed portions of the costs of maintaining the automobiles which Riss & Company and T.M. & E. provided for petitioner's personal use and the use of his wife and sister. Respondent has determined that petitioner's personal use of the automobile furnished him by Riss & Company resulted in his realization in each year of income of not less than $1,000. The evidence before us does not show the total cost to Riss & Company of maintaining the automobile nor any basis for allocation of costs between business and personal use. Respondent's determination is therefore sustained. Petitioner argues that he realized no personal benefit from the use of the service automobiles which T.M. & E. furnished for the use of his wife and *283 sister. This argument, we think, is without merit. Neither the wife nor the sister was a stockholder of T.M. & E. during those years. Riss, Sr., owned a majority of T.M. & E.'s stock and was the chairman of the board of directors. Richard Riss was president of the company, and also vice president during 1953 and 1954. As pointed out above Riss, Sr., was at all times in control of both T.M. & E. and Riss & Company. There is no denial that the company automobiles were furnished to his wife and sister by T.M. & E. at his direction. Whether or not he was under any legal obligation to furnish either of them with an automobile for their personal use, he nevertheless benefited from the satisfaction of his personal desires in the matter. Petitioner has conceded in his petitions that his wife and sister had the use of the automobiles and that reasonable amounts may be allocated to such use, but that allocations made by respondent are unreasonable and excessive. The statement contained in the petition in Docket No. 74954 applicable to the years 1952, 1953 and 1954 is as follows: Petitioner's wife, Louise V. Riss, and his sister, Lena Riss, occasionally availed themselves of the use of automobiles *284 owned by Transport Manufacturing & Equipment Company. The petitioner concedes a reasonable sum may be allocable as income for the use of these automobiles but denies the excessive sum asserted in the statutory notice to be a reasonable value for such use. We take the concessions made by petitioner to mean that some portions of the amounts in dispute are includable in his income and that he is contesting only the amounts of the allocations made by respondent; otherwise the concessions are meaningless. There is no evidence before us as to the type or extent of the use of the automobiles by either the wife or sister and we have no way of determining whether the allocations made by the respondent are excessive. Respondent's determination of the amounts includable in petitioner's income in each of the years is therefore sustained. Issue 36 (XLIX) Head of a Household Findings of Fact In his returns for the years 1952 to 1955, inclusive, petitioner claimed the status of head of a household. He gave 6505 State Line, Kansas City, as his address. Respondent determined that petitioner did not qualify as head of a household, giving as one of his reasons that petitioner was not an *285 occupant of the State Line residence. The petitions filed on petitioner's behalf (Docket No. 74954 for 1952, 1953 and 1954) and Docket No. 81486 (for 1955) contain no allegation of error with respect to respondent's failure to compute petitioner's tax liability as head of a household. This question is raised by petitioner for the first time in its brief. Opinion Respondent contends first that the question of petitioner's qualification as head of a household has not been properly pleaded and is not at issue in these proceedings. Reference is made to the Tax Court Rules of Practice, Rule 7. We agree with respondent and so hold. See Louis Wellhouse, Jr., 3 T.C. 363, and cases there cited. We might point out, however, that there is no evidence that petitioner ever occupied the State Line residence with his daughter and divorced wife, which would have been necessary to satisfy the statutory requirements for qualification as head of a household. Issue 37 (L) DC-4 Airplane - Rentals and Depreciation Findings of Fact In July 1953 petitioner entered into an agreement with Edward J. Daly for their joint purchase of a damaged DC-4 airplane. The airplane had previously *286 been owned by Braniff National Airways and was being sold by its insurers. The purchase price was $150,000. Daly agreed to contribute $75,000 to the venture and petitioner agreed to furnish the balance of the purchase price and whatever additional funds might be needed for repairs. Pan American World Airways had agreed with Daly to make the necessary repairs under a contract dated June 16, 1953. The written agreement between petitioner and Daly dated July 7, 1953, was in part as follows: 1. Riss and Daly shall engage in a joint venture for the purpose of purchasing the said damaged Douglas DC-4 aircraft, and repairing and selling said aircraft for a profit after the repairs are completed. 2. The total purchase price for the damaged aircraft to be paid to Air Carrier Service Corporation, acting as agent for British Insurance Underwriters, shall be $150,000.00, $75,000.00 of which is to be paid by Daly and the remaining $75,000.00 to be paid by Riss within the time required by Air Carrier Service Corporation's acceptance of Daly's offer. * * *
8. Upon completion of the repairs to the aircraft and delivery by Pan American World Airways System, in accordance with the contract *287 of repair dated June 16, 1953, both Riss and Daly will exert their best efforts to obtain a purchaser for the aircraft in order to achieve a maximum profit under this joint venture and neither Daly nor Riss shall receive nor share in any broker's fee or commission for finding a purchaser. No fees, commissions or expenses shall be paid in connection with this joint venture to any person without the written consent of both Daly and Riss. The aircraft shall not be sold prior to six (6) months after Daly and Riss obtain title. * * *
11. Promptly after the sale of the aircraft, proceeds from the sale of the equipment, components, parts, accessories and the aircraft shall be distributed as follows: First, expenses incident to the sale shall be paid, including travel expenses advanced to Daly. Second, the investment of Riss shall be returned. Third, from the remaining proceeds the investment of Daly should be returned. Finally, the balance of the proceeds, if any, after payment of all expenses incident to this joint venture not previously paid, shall be divided equally between Riss and Daly. It is expressly understood that in the event that the proceeds received from the sale of the *288 equipment, components, parts, accessories and the aircraft shall be less than the total investment of both Riss and Daly, the entire investment of Riss shall be returned before any part of Daly's investment is returned to him. The repair work on the DC-4 required about 6 months. In the meantime the market for that type of airplane had undergone a considerable decline. Petitioner and Daly attempted to sell the airplane but were unsuccessful. On January 1, 1954, Daly assigned all of his rights in the airplane to petitioner for $75,000, represented by petitioner's promissory note for that amount. The note was payable out of the excess of the proceeds from the sale of the plane, if and when sold by petitioner, over petitioner's investment therein and any remaining amount of such excess was to be divided equally between petitioner and Daly. The agreement contained the further provision that: 4. In the event that Riss leases the aircraft and under the provisions of paragraph 3(b) above, Riss has paid Daly seventy-five thousand dollars ($75,000.00) plus interest out of rental from the lease, then Daly shall have the option to purchase from Riss a one-half interest in the aircraft and *289 one-half interest in any deposits received by Riss from the lessee upon termination of the lease on account of airframe and engine time, upon the payment by Daly to Riss of one hundred dollars ($100.00) in cash. Thereafter and until August 12, 1954, petitioner and Daly continued their efforts to sell or to lease the airplane but could find no purchaser or lessee. On that date, August 12, 1954, petitioner entered into a lease agreement with World Airways, Incorporated, hereinafter referred to as World Airways, as lessee, under which the lessee was to rent the airplane for 3 years beinning August 21, 1954, for a rental of $12,028.97 per month. The lease agreement provided that: 3. Lessee shall pay to lessor, in addition to the amount specified in paragraph two above five dollars ($5.00) for each hour of airframe time while in the operation of lessee and four dollars and fifty cents ($4.50) for each hour of engine time on each engine while in operation by lessee. The amounts paid to lessor for airframe and engine times shall be deposited by lessor in any bank or trust company of lessor's choice. The amounts so deposited shall be paid out by lessor to lessee only for the purpose of *290 defraying expense of major overhaul or necessary replacements in the airframe including surface controls and engines of the aircraft. It is the purpose and intention in paying and depositing these amounts to create a fund to assure lessor that lessee will perform major overhauls as necessary for the operation and maintenance of the aircraft and to assure lessor of the return of the aircraft in good condition. Title to these amounts shall be vested in lessor absolutely upon default by lessee of any of the terms of this agreement. The lessee agreed to maintain the airplane in good operating condition and to pay all costs of repairs, except that the cost of any "major overhauls" of either the aircraft or engines would be paid out of the airframe and engine time deposits mentioned in paragraph 3 of the agreement. The agreement further provided that: 11. In the event of termination or upon expiration of this agreement, lessee shall at its expense deliver the aircraft to lessor at Teterboro, New Jersey in equally good repair and operating condition as of the date of this lease, normal wear and tear excepted, together with all components, equipment and accessories a part of or leased *291 with the aircraft including records, books, manuals and other papers pertaining to the aircraft. In the event that the flight time since major overhaul on the aircraft frame and engines at the date of termination or expiration of this agreement exceeds such flight times since major overhaul at the date of this lease, lessee shall pay to lessor such amount if any as may be necessary to provide five dollars ($5.00) for each hour of airframe utilization and four dollars and fifty cents ($4.50) for each hour of utilization of each engine less such amount as may be then deposited by lessor in accordance with paragraph three (3) hereof. World Airways was a licensed supplemental air carrier. Daly was president of the company and owned all of its outstanding stock, consisting of 90,000 shares of Class A common, 10,000 of Class B common and 14,047 shares of preferred. In connection with the execution of the lease agreement of August 12, 1954, and on the same date Daly and petitioner entered into another agreement titled "Sale of Stock." This agreement to which World Airways was a party provided in part as follows: Whereas, Daly is the sole owner of all of the issued and outstanding common *292 and preferred stock of World Airways, Incorporated, a corporation existing under and by virtue of the laws of the State of Delaware, consisting of ninety thousand (90,000) shares of Class A common, ten thousand (10,000) shares of Class B common, and one thousand four hundred forty-seven (1447) shares of preferred; Whereas, Daly desires to obtain the support and experience of Riss to assist in improving and expanding the operation of World Airways; Whereas, World requires additional working capital and the assistance of Riss to expand and improve its business; Now, therefore, in consideration of the mutual promises, conveyances, terms, undertakings and conditions hereinafter set forth each of which shall be mutually interdependent it is agreed as follows: 1. Riss will loan to World Airways five thousand dollars ($5,000.00) without interest for a period of one hundred twenty days and World shall upon receipt of such funds give to Riss its note for that amount payable on or before one hundred twenty days. 2. Daly will loan to World Airways five thousand dollars ($5,000.00) without interest for a period of one hundred twenty days and World shall upon receipt of such funds give *293 to Daly its note for that amount payable on or before one hundred twenty days. 3. Daly will forthwith transfer and convey and cause to be transferred on the stock record books of World to Riss forty-four thousand one hundred (44,100) shares of Class A common, four thousand nine hundred (4,900) shares of Class B common and seven hundred four (704) shares of preferred stock of World and in connection with this conveyance to Riss, Daly warrants that he is the true and lawful owner of such stock, that the stock is not encumbered, pledged or hypothecated to any person and that he has full right and title to make such transfer and conveyance. 4. Daly will forthwith deliver to an escrow agent selected by Riss one thousand eight hundred (1,800) shares of Class A common, two hundred (200) shares of Class B common and twenty-nine (29) shares of preferred stock of World endorsed in blank. The escrow agent shall hold this stock until such time as World shall have performed satisfactorily its agreement dated August 10, 1954, with Riss for the lease of the Douglas DC-4 and shall have paid to Riss in lease rental the sum of $433,042.93. So long as World is satisfactorily discharging the requirements *294 of the lease agreement the stock held by the escrow agent shall not be voted. At such time as World shall have paid to Riss the sum of $433,042.93 in lease rentals and otherwise satisfactorily discharged its obligations under the lease agreement, the escrow agent shall return to Daly the stock held in escrow and such stock may thereafter be voted. In the event that World defaults or otherwise fails to perform its lease agreement with Riss and the lease agreement is thereby terminated, the escrow agent shall be authorized to sell and convey, vote and otherwise exercise all the rights and privileges of ownership of such stock. 5. During the term of the lease of the Douglas DC-4B aircraft by World from Riss, World shall pay and Daly shall receive a salary of five hundred dollars per week plus reasonable and necessary expenses. World shall not during the term of such lease sell any of its stock without prior notice and approval of its stockholders entitled to vote. Daly shall not sell, transfer, mortgage, encumber or otherwise dispose of stock of World held by him during the term of the lease by World of the Douglas DC-4B aircraft. In the event that Riss desires at any time to sell his *295 stock or Daly subsequent to the term of the lease agreement desires to sell his stock, Riss or Daly shall first offer the stock to the other at the price offered by third parties. World Airways continued to operate the airplane under the lease agreement until about the end of January when it was sold to Bankers Life and Casualty Company of Chicago, Illinois. The contract of sale was entered into December 23, 1954, and delivery of the airplane was to be made January 25, 1955. The sale price, including $5,000 for spare parts, was $380,000. World Airways continued to operate the airplane under the terms of the lease agreement until it was delivered to Bankers Life and Casualty Company January 25, 1955. The lease agreement was then cancelled. During the operation of the lease, World Airways paid to Riss, Sr., the rentals of $12,028.97. It also paid the airframe and engine time payments as provided in the lease amounting to $12,800.88 in 1954 and $8,766.87 for September 1954 to January 1955, inclusive. Both the rentals and the time payments were paid by checks drawn to Riss, Sr., which were endorsed and deposited by him to T.M. & E.'s bank account. In its books and records T.M. & *296 E. credited the checks to an account receivable due from Riss, Sr., entitled "Mr. R. R. Riss Airplane Account." There was no major overhaul for the airplane or the engines during the period of the lease. The purchase price was paid by Bankers Life and Casualty Company by checks payable to petitioner for $50,000 [*] December 23, 1954, when the contrust of sale was executed, and for $330,000 [*] January 24, 1955. In his returns for 1954 and 1955 petitioner included the rentals received from World Airways but did not report as ordinary income the amounts received as airframe and engine time payments. Instead he reported them in his 1955 return as a part of the sale price of the airplane. Respondent determined that these payments are taxable to petitioner as ordinary income in the years when he received them. In the alternative, he contends that they are all taxable to petitioner as ordinary income in 1955 when the airplane was sold. Petitioner claimed depreciation deductions on the airplane of $121,776 in 1954 and $10,148 in 1955, based on a cost of $165,314.76 and a useful life of 3 years. No provision was made in the depreciation computations for any salvage value. Respondent *297 determined that petitioner is entitled to depreciation deductions of $29,685.20 in 1954 and $7,421.33 in 1955, based on a useful life, to petitioner, of 5 months and a salvage value of $380,000. On May 13, 1955, petitioner sold back to Daly for $10,000 all of the stock which Daly had transferred to him in August 1954. Respondent has determined that petitioner realized income of $10,000 in 1954 on the receipt of shares of stock of World Airways, which he received from Daly August 12, 1954. In the altrenative respondent contends that the $10,000 was income realized by petitioner in 1955. Opinion The following questions are presented under this issue: 1. Whether petitioner realized ordinary income on the receipt of the airframe and engine time payments made by World Airways in 1954 and 1955, and if so, in what year or years; 2. The depreciation deductions allowable to petitioner on the airplane in 1954 and 1955, and 3. Whether petitioner realized ordinary income of $10,000 on the receipt of the World Airways, Incorporated, stock in 1954 or on the sale of the stock in 1955. As to the first question, there can be no denial that petitioner was enriched by the receipt, or retention, *298 of all of the airframe and engine time payments which were paid to him by World Airways. The lease agreement of August 12, 1954, under which the payments were made provided that they were to be held in escrow for some indefinite period for the limited purpose of guaranteeing payments or defraying costs of major overhauls of the airplane. They were never used for that purpose, and in fact were never placed in any separate trust or escrow account. They were paid directly to petitioner and deposited in T.M. & E.s bank account, where presumably they remained, subject to the escrow provisions of the lease agreement, until the airplane was sold and the case terminated. Thereafter they were retained by petitioner as his own without any question being raised as to their ownership. Petitioner's treatment of the payments as part of the price received from the sale of the airplane has no causative explanation. No mention of the time payments was made in the sale contract and they were not included in the sale price, all of which the purchaser paid by checks. The choice which seems to confront us is whether the time payments should be treated as income to petitioner in 1954 when received by *299 him or in 1955 when they were freed from the escrow restrictions. In Clinton Hotel Realty Corporation v. Commissioner, 128 F. 2d 968 (C.A. 5) the court held, reversing the Tax Court on this point, 44 B.T.A. 1251, that a sum of money which was deposited with a lessor by the lessee under a 10-year lease as security for payment of the rent and other covenants and which was finally to be applied as rent for the last year of the lease was not taxable to the lessor as advanced rent in the year when received. The court reasoned that the funds were not intended as advance rent and that the lessor had no present right to them and did not claim beneficial ownership of them. North American Oil v. Burnet, 286 U.S. 417, involving the receipt of income under a claim of right, was held inapplicable. The opposite result was reached by the same court in Astor Holding Co. v. Commissioner, 135 F. 2d 47, where the facts were similar but where the payment was intended as advance rent and there was no restriction as to the lessor's use of it. The court said: If an amount is deposited with a lessor merely as security for the performance of covenants, *300 with no present right or claim of full ownership in the lessor, it is not treated as taxable income unless and until something happens to make the deposit, or a portion of it, the property of the lessor. * * * Here the agreement of the parties was that the payments were to be held in escrow solely as security for the major overhauls of the airplane while operated by the lessee and could be used for no other purpose. As long as the possibility of such a use existed petitioner had no beneficial rights in the payments. The evidence does not show, nor does respondent contend, that petitioner exerted or entertained any claim of right to the fund until after termination of the lease. It was then, in 1955, that petitioner did advance such a claim of right (that the fund comprised a part of the sale price) and, for all the evidence shows, his claim was never challenged. Whether this claim emanated from some agreement with Daly or the lessee, World Airways, in which petitioner then owned approximately one-half interest, or whether it was solely of petitioner's making, the evidence does not disclose. We conclude, therefore, in accordance with respondent's alternative contention that the time *301 payments were ordinary income to petitioner in the year 1955. Petitioner computed depreciation on the DC-4 from January 1, 1954, whereas respondent determined that depreciation deductions should begin not earlier than August 12, 1954, when the airplane was put into productive use. Section 167 of the Internal Revenue Code of 1954 permits deductions for depreciation of property used in the trade or business, or of property held for the production of income. Although the airplant was not used by petitioner in its trade or business it was, as respondent has determined, held for the production of income. The question is, first, when it became so held by petitioner. It was originally acquired by petitioner and Daly for the purpose of resale for profit and later was held for lease. We think that it was held for the production of income by petitioner from January 1, 1954, the time that it was first offered for sale or lease by him. One of respondent's requested findings of fact is that: During the period from January 1, 1954, to August 12, 1954, both Daly and Riss, Sr., attempted to recover their investment by making continuous efforts to sell or lease the DC-4. *302 Certainly the airplane was held for the production of income during that period, although it actually produced no income until August 1954. See P. Dougherty Co., 5 T.C. 791, affd. 159 F. 2d 269 (C.A. 4); Mary Laughlin Robinson, 2 T.C. 305; William C. Horrmann, 17 T.C. 903. The other required factors for the computation of depreciation on the airplane are useful life and salvage value. Petitioner claimed a useful life of 3 years with no account of salvage value. Respondent determined a salvage value of not less than $328,208.27, the actual sale price of $380,000 less the cost of the sale, $51,791.73. He depreciated the remaining cost over a period of 5 months, the time that the airplane was actually owned by petitioner after its lease to World Airways, Incorporated. The sum of the depreciation deductions allowed by respondent in 1954 and 1955 equals, approximately, the excess of cost over sale price. In support of his depreciation adjustments respondent relies principally on Massey Motors v. United States, 364 U.S. 92, and Cohn v. United States, 259 F. 2d 371 (C.A. 6). The Massey Motors decision requires *303 estimates at the time of acquisition of both the resale or salvage value of the asset and its useful life, based on the period for which it is reasonably expected to be used in the taxpayer's business. We do not believe that the computations of either petitioner or respondent meet those requirements. There is no discernible relationship between the actual sale price of the airplane at about the end of 1954 and its reasonably estimated resale value, either when it was acquired by petitioner or when it was leased to World Airways, Incorporated. The evidence is that the airplane was 12 or 15 years old when purchased. There is no proof as to its resale value or remaining useful life either before or after its renovation. Petitioner and Daly had hoped to receive a price for the airplane in excess of their cost. The realization of such a profit was their sole reason for purchasing it. There is no evidence that they made any estimate of the resale price. Neither is there any support for petitioner's estimate of a useful life of 3 years when he acquired full ownership of the airplane. Whatever burden of proof rests on petitioner in this respect he has failed to meet. As is now stands respondent *304 has allowed depreciation deductions which, with the actual resale price, permit petitioner to recover his entire costs. The result at least in inconformity with what the Supreme Court has said was the intent of Congress, [14] if we accept the actual resale price as the estimated resale value. This brings us to the third question, whether petitioner realized ordinary income of $10,000 on the receipt of the World Airways, Incorporated, stock in 1954, as respondent determined, or, in the alternative, in 1955 when he sold it. Petitioner treated the amount as a part of the sale price. Respondent's determination that petitioner realized ordinary income on the receipt of the stock in 1954 is, we think, erroneous. We agree with respondent's alternative contention that petitioner realized a gain on the sale of the stock in 1955, but we think that it was a capital gain rather than ordinary income. There was no element of taxable gain in petitioner's *305 acquisition of the World Airways, Incorporated, stock in 1954. It was transferred to him not in payment for any services rendered either to World Airways, or Daly, but in consideration for his undertaking to lend financial support and other aid to the company and to enable him to protect his investments in the airplane venture. Actually petitioner's acquisition of the stock was more in the nature of a purchase. His realization of gain was when he sold it back to Daly in May 1955. Petitioner now concedes that he had no cost base for the stock and that he realized a capital gain on the sale of $10,000. Issue 38 (L, LI, LII, LIII) Loss on Farm Operation Findings of Fact In his returns for 1952, 1953, 1954 and 1956, petitioner claimed losses from farm operation in the respective amounts of $1,486.38, $2,182.42, $2,108.04 and $662.81. Respondent disallowed the deduction of the claimed losses on the grounds that they were nondeductible personal expenses. The property in question, hereafter referred to as the Pittman Road Farm, was a tract of about 71 acres located on Pittman Road, Jackson County, Missouri. There was a lake on the property which covered most of the area. In each *306 of the years 1952 to 1956, inclusive, the Pittman Road Farm was rented to Riss & Company for fishing and recreational use by its employees and customers for a yearly rental of $1,200. Petitioner reported the rent as income in his returns. The Pittman Road Farm was not in fact operated as a farm. Petitioner kept a few cows and sheep on it but the production of salable commodities was negligible. Petitioner lived on the premises a portion of each of the years involved and listed it as his home in his return for 1956. The deduction claimed by petitioner and disallowed by respondent in each year is the excess of the expenses incurred in maintaining the property over the rents and other receipts therefrom. Opinion The evidence shows affirmatively that the Pittman Road Farm was not operated as an income producing farm enterprise. It fails to show that it was owned and operated by petitioner as any other type of profit making venture, and petitioner does not so allege. We think that the farm was maintained by petitioner for recreation and pleasure and not for profit. Respondent's disallowance of the deductions claimed is therefore sustained. Issue 39 (LIV, LV and LVI) The following *307 issue numbered 39 pertains to Oklahoma-Colorado - Docket No. 77065 Findings of Fact Respondent has determined that petitioner, Oklahoma-Colorado, is liable for surtax on profits undistributed (section 102 Internal Revenue Code of 1939) of $5,950.70 in 1952 and $6,412.21 in 1953 and for accumulated earnings tax (section 531 Internal Revenue Code of 1954) of $5,542.52 in 1954. Some of the facts pertaining to petitioner's organization and operations have been set out above under other issues and will not be repeated here except as necessary for proper presentation of this issue. In summary Oklahoma-Colorado was a wholly owned subsidiary of T.M. & E. until 1952 when its stock was sold to Robert, Richard and Louise, in equal shares at a price considerably below its fair market value. [15]
Petitioner's only business activity was the ownership and lease of freight transportation equipment to Riss & Company under substantially the same arrangement as that between *308 Riss & Company and T.M. & E. The rentals from that equipment were its chief source of income. In its returns petitioner reported net income of $22,150.66 in 1952, $42,740.48 in 1953 and $30,705.25 in 1954. Petitioner's balance sheets for the years ended December 31, 1951 to December 31, 1954, show the following assets and liabilities: ASSETS
Dec. 31, 1951
Dec. 31, 1952
Dec. 31, 1953
Dec. 31, 1954
Cash
$ 318.47
$ 16,519.61
$ 69,231.76
$ 14,783.16
Equipment
198,894.91
198,894.91
186,910.87
19,067.56
Reserve for
(145,081.35)
(170,937.85)
(168,424.66)
(18,000.57)
Depreciation
Notes Rec. - R.
18,000.00
R. Riss
Notes Rec. - Kay
28,400.00
McAuliffe
Accounts Rec. -
Riss, et al.
Accounts Rec. -
R. R. Riss
Accounts Rec. -
5,333.34
762.19
16,005.41
R. R. Riss
Notes Rec. - R.
5,333.33
R. Riss, II
Accounts Rec. -
762.20
16,362.20
R. R. Riss, II
Accounts Rec. -
5,333.33
Louise V. Riss
Fruehauf Trailer
85,488.12
Co.
$ 54,132.03
$ 60,476.67
$ 89,242.36
$180,105.88
LIABILITIES &
CAPITAL
Mortgages &
$ 22,530.75
$ 6,743.50
$ 54.05
$ 20,030.00
Accounts Payable
Income Taxes
7,285.34
20,429.83
11,335.08
Payable
Capital Stock -
15,000.00
15,000.00
15,000.00
15,000.00
Preferred
Capital Stock -
1,000.00
1,000.00
1,000.00
1,000.00
Common
Unrealized Gain
59,743.80
on Installment
Sale
Earned Surplus
15,601.28
30,447.83
52,758.48
72,997.00
Total Surplus &
$ 54,132.03
$ 60,476.67
$ 89,242.36
$180,105.88
Liabilities
*309 Petitioner's earned surplus available for distribution to its shareholders, as reflected in its books and after giving effect to the adjustments made by respondent in his notice of deficiency, in each of the years was as follows: After Adjust-
Year
Per Books
ments
1952
$ 30,447.83
$30,624.41
1953
52,758.48
46,922.78
1954
72,997.00
91,064.07
1955
120,474.64
86,881.99
1956
125,920.66
91,727.57
In compliance with section 534(b) of the Internal Revenue Code of 1954, respondent gave notice to petitioner by registered mail of his determination of deficiencies for the years 1952, 1953 and 1954, due in part to its accumulation of earnings and profits beyond the reasonable needs of the business. Petitioner did not submit any statement in response thereto in accordance with subsection (c) of section 534. Opinion Petitioner argues on brief that respondent is "foreclosed" from asserting that it was availed of for the purpose of avoiding the income tax with respect to its stockholders because of his stipulation that "its stockholders" are liable for an additional tax resulting from the purchase of petitioner's stock at a price *310 less than its fair market value. It argues that as a result of that stipulation the shareholders have already paid taxes on income which reflects the capital and surpluses subject to the accumulated earnings tax. The very lack of merit in this argument makes it difficult to answer. Perhaps all that need be said is that the accumulated earnings tax imposed on corporations and the income tax imposed on its individual stockholders are separate taxes unrelated to and independent of each other. Also, petitioner's argument ignores the fact that Robert, Richard and Louise were not stockholders of petitioner before they purchased this stock in 1952, and there is no showing that any part of the stipulated difference of $93,809.21 between sales price and value was comprised of the alleged improperly accumulated surplus now sought to be taxed. Petitioner makes the further argument that with the elimination of the increase in undistributed earnings resulting from the depreciation adjustments made by respondent, its balance sheets would reflect no accumulation of earnings beyond the reasonable needs of the business, such as the eventual replacement of its income producting equipment. Petitioner's *311 earned surplus before and after respondent's adjustments is shown above. It was only slightly more after the 1952 and 1953 adjustments than before. It could hardly be called less than substantial in any of the years. Petitioner has not undertaken to show what specific needs it may have had for capital in the operation of its business. Although it refers in its argument to the replacement of equipment there is no evidence as to what capital if any was intended to be used, or might have been required, for that purpose. On petitioner's failure to meet its burden of proof with respect to accumulated earnings, respondent's determination is sustained. Recomputation of the tax will depend on the result of our decisions in the other issues in this proceeding. Except as stipulated by the parties the evidence does not show that any parts of the deficiencies herein are due to negligence or intentional disregard of rules and regulations, within the purview of sections 293(a) and 6653(a), respectively, of the 1939 and 1954 Codes. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Riss & Company, Inc., (A Colorado Corporation), Docket No. 74951; Transport Manufacturing & Equipment Company (a Delaware corporation), Transferee, Docket No. 74952; Transport Manufacturing & Equipment Company (an Illinois corporation), Docket No. 74953; Richard R. Riss, Sr., Docket No. 74954; Oklahoma-Colorado Freight Lines, Inc., Docket No. 77065; Transport Manufacturing & Equipment Company of Delaware, Docket No. 78372; Richard R. Riss, Sr., Docket No. 81486; and Richard R. Riss, Sr. and Helen G. Riss, Docket No. 81487.↩
2. The written stipulation of facts consists of over 200 printed pages. Other stipulations were read into the record during the course of trial.↩
3. In their briefs petitioners enumerate 105 separate issues and the respondent 68.↩
4. The Roman numerals appearing in parentheses correspond to the issue numbers in the briefs filed by the parties.↩
5. Many of the detailed facts pertaining to the acquisition of the equipment in question and the terms of the purchase and lease agreements are set out in the stipulation which we have incorporated herein and will not be repeated here.↩
6. 2. Accordingly, effective May 12, 1953, and as respects all open years for which agreement as to the tax liability has not been reached at any level within the Internal Revenue Service as of that date, it shall be the policy of the Service generally not to disturb depreciation deductions, and revenue employees shall propose adjustments in the depreciation deduction only where there is a clear and convincing basis for a change. This policy shall be applied to give effect to its principal purpose of reducting controversies with respect to depreciation. ↩
7. 1. The purpose of this Revenue Ruling is to furnish guidance with respect to the application of Revenue Ruling 90, page 43, which sets forth the policy with respect to depreciation adjustments. 2. Among the factors which should be given careful consideration in order to give full force and effect to the announced policy are the following: (a) Whether depreciation rates used by the taxpayer are fair and reasonable under the circumstances; (b) Whether the taxpayer has followed a consistent practice in arriving at the amount of depreciation deductions; (c) Whether in considering all factors, including reasonable tolerances, any adjustments proposed are substantial.↩
8. The period for depreciation of an asset shall begin when the asset is placed in service.↩
8a. Not the same person as General Carlos P. Romulo who was formerly president of the United Nations General Assembly and who was formerly Ambassador to the United States from the Republic of the Philippines. By order of the Tax Court dated 9/28/64 and signed by Judge Forrester, footnote 8a was added.
*↩
9. Riss, Sr., testified that he had always wanted to go into the construction business and took this opportunity for doing so.↩
10. Among the cases cited by respondent in this connection are International Trading Co., 275 F. 2d 578; American Properties, Inc., 28 T.C. 1100, aff'd. 262 F. 2d 150, and Challenge Manufacturing Co., 37 T.C. 650↩.
11. The term "repairs," which is objected to by respondent, is used merely as a descriptive term without any legalistic connotations.↩
12. The parties have stipulated the useful life of the terminal buildings and facilities at both the Jersey City and Cleveland terminals.↩
13. Petitioner states in its brief that: "* * * he [Richard] was in continual and close contact with all of the over-all operation of Riss & Company insofar as it related to the equipment leased by T.M. & E. for use by Riss & Company."↩
14. Congress intended that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the estimated salvage, resale or secondhand value. Massey Motors, Inc. v. United States, 364 U.S. 92↩.
15. The parties have stipulated that the excess of the fair market value of $109,809.21 over the sale price of $16,000 is taxable to the Riss children in equal shares in the year of the sale.↩